```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                         SOUTHERN DIVISION

 3

 4   TARA EDWARDS,

 5              Plaintiff,
     -v-                                    Case No. 18-10735
 6
     SCRIPPS HOWARD MEDIA, INC.,
 7   d/b/a WXYZ-TV,

 8              Defendant.
     _____/
 9

10        PLAINTIFF'S MOTION TO COMPEL DOCUMENTS, ET AL

11     BEFORE THE HONORABLE MAGISTRATE ELIZABETH A. STAFFORD

12        Detroit, Michigan, Tuesday, November 13th, 2018.

13

14   APPEARANCES:

15   FOR THE PLAINTIFF:       MICHAEL N. HANNA
                              WARREN ASTBURY
16                            Morgan & Morgan, P.A.
                              2000 Town Center
17                            Suite 1900
                              Southfield, MI 48075
18

19
     FOR THE PLAINTIFF:       ANGELI MURTHY
20                            Morgan & Morgan, P.A.
                              600 North Pine Island Road
21                            Suite 400
                              Plantation, FL  33324
22

23

24

25
```

```
 1    (Appearances, continued):

 2
      FOR THE DEFENDANTS:      ELIZABETH P. HARDY
 3                             THOMAS J. DAVIS
                               Kienbaum, Opperwall, Hardy
 4                             & Pelton, P.L.C.
                               280 North Old Woodward Avenue
 5                             Suite 400
                               Birmingham, MI  48009
 6

 7    RECORDED BY:            MARLENA WILLIAMS, Case Manager

 8
      TRANSCRIBED BY:         David B. Yarbrough, CSR, RMR, FCRR
 9                            Official Court Reporter
                              (313) 234-2619
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
                 (Transcriber not present at live proceedings)
25            (Transcript produced from digital voice recording)
```

# TABLE OF CONTENTS

PAGE

WITNESSES:

NONE

EXHIBITS

NONE

```
1              Detroit, Michigan.
2              Tuesday, November 13th, 2018.
3              At or about 1:49 p.m.
4                          --    ---    --
5         THE CLERK OF THE COURT:  All rise.  Court is back in
6    session, the Honorable Elizabeth A. Stafford, United States
7    Magistrate Judge, presiding.  You may be seated.
8              The Court calls case number 18-10735, Tara Edwards
9    versus Scripps Media, Incorporated doing business as WXYZ-TV.
10   Counsels, please place your appearances on the record.
11        MR. HANNA:  Good morning, Judge.  Michael Hanna on
12   behalf of the plaintiffs and with me is my counsel, Warren
13   Astbury and Angeli Murthy.
14             THE COURT:  Good afternoon.
15             MS. HARDY:  Good afternoon.  Elizabeth Hardy on
16   behalf of Scripps Media, Inc.
17             MR. DAVIS:  Good afternoon, your Honor.  Thomas Davis
18   on behalf of Scripps Media, Inc.
19             THE COURT:  Okay.  I want to begin by addressing a
20   couple of general observations.  First, Mr. Hanna, half of your
21   briefs are in the footnotes and it appears to me to clearly be
22   an effort to increase the amount that you can write within the
23   page limits and under rule, the local Rule 7.1, it does
24   explicitly state that attempts to circumvent the local rule in
25   any way may be considered an abuse of practice which may result
```

1    in the motion or response being stricken as well as sanctions

2    under local Rule 11.1.

3         Another part of that is that the reason for the font

4    rules, it used to be font 12, now it's font 14 is because we

5    read an incredible amount and by putting so much in the

6    footnotes single-spaced, it's very hard to read.  So I am going

7    to include in any order a warning that continuing to do that

8    could result in your brief being stricken and/or sanctions

9    because it's just not, not fair to have us try to look at half

10   of a page of footnotes when your brief is supposed to be

11   double-spaced for a reason.

12        The other thing that I wanted to address was the

13   scope of discovery and Ms. Hardy, your brief in particular said

14   repeatedly that the standard of discovery, the scope was the

15   reasonably calculated to lead to admissible evidence.  That

16   hasn't been the standard for nearly three years.  The scope of

17   discovery is that parties may obtain discovery regarding any

18   non-privileged matter that is relevant to any parties' claim or

19   defense and proportional to the needs of the case considering

20   the importance of the issues at stake in the action, the amount

21   in controversy, the parties' relative access to relevant

22   information, the parties' resources, the importance of the

23   discovery in resolving the issues and whether the burden or

24   expense of the proposed discovery outweighs its likely benefit,

25   information within the scope notified not be admissible in

```
 1    evidence to be discoverable and even though you did not use
 2    that terminology as much, Mr. Hanna, you're, really all of the
 3    or many of the discovery requests at issue seem to be based
 4    upon the prior reasonably-calculated language and so I do think
 5    that a lot of them are, on both sides are too broad and not
 6    tailored to the claims or defenses.  So I do want to make sure
 7    that we're on the, all on the same page regarding the claims
 8    and I'm going to say what I understand and you all can tell me
 9    whether I have the correct understanding about what this case
10    is about.  It appears to be that the plaintiff was subjected to
11    sexual harassment and complained about it, that the defendant
12    investigated, silenced the plaintiff and imposed an
13    insufficient punishment on Mr. Maddox and that that led to
14    others believing the rumors about the plaintiff to be true and
15    that because of that, the plaintiff was constructively
16    discharged.  Is that accurate?
17              MR. HANNA:  Yes, Judge.
18              THE COURT:  And in terms of the sex discrimination,
19    can you explain to me what you mean by sex discrimination?
20              MR. HANNA:  Sexual harassment, Judge.
21              THE COURT:  Okay.  So you're not saying that the
22    plaintiff was treated, umm --
23              MR. HANNA:  Not gender discrimination, Judge.
24              THE COURT:  You're not saying that she was treated
25    differently than similarly-situated people who aren't women?
```

1           MR. HANNA:  No, Judge.

2           THE COURT:  Okay, and the retaliation that you're

3   alleging is what?

4           MR. HANNA:  In essence, Judge, she objected to sexual

5   harassment and because defendant's response to that sexual

6   harassment was retaliatory, so they failed to take effective

7   remedial measures.  They, in ess --

8           THE COURT:  Well, that's one thing.  Retaliation is

9   doing something that would deter someone else from making a

10  complaint.  I'm trying to -- and so I'm not asking you what

11  they didn't do, I'm asking you what you're saying the defendant

12  did in retaliation.

13          MR. HANNA:  So a lot of these, the, the legal

14  theories behind these claims overlap.  So some of the hostile

15  work environment factors overlap with the retaliation --

16          THE COURT:  I understand that.  I'm asking you

17  specifically what you're saying the defendant did in

18  retaliation.

19          MR. HANNA:  There's many things and it's, the record

20  is getting established in discovery.  For example, Judge, my

21  client alleges that she was not provided anchor opportunities

22  after she complained about the sexual harassment.  Prior to the

23  complaint, she had a lot of anchor opportunities which is where

24  she, you know, is able to anchor and she wasn't provided that

25  opportunity after she alleged sexual harassment, so for

1    example, that's part of the retaliation.  My client alleges

2    that her schedule was switched in order to accommodate the star

3    anchor who was promoted after the sexual harassment complaint.

4        THE COURT:  In retaliation for the sexual harassment

5    complaint, because you're saying that -- I understand that to

6    be what you're saying was insufficient punitive measures on

7    Mr. Maddox.  Are you saying that because she made the sexual

8    harassment complaint, she was given an unfavorable schedule?

9        MR. HANNA:  And, and yes and the failure to provide

10    her with anchoring opportunities and to allow her to advance

11    and promote her career.  She received those opportunities

12    before she complained.  She was the rebel rouser and she

13    complained about sexual harassment.  Thereafter, she was not

14    provided with these opportunities.

15        THE COURT:  Okay and I understand that your

16    damages -- well, I guess I'll ask you.  I understand the

17    damages that you're alleging to be lost wages and benefits,

18    exemplary damages and punitive damages?

19        MR. HANNA:  No, Judge, we're -- exemplary damages and

20    compensatory damages.

21        THE COURT:  Well, what's the compensatory damages?

22    So you're not alleging punitive damages?

23        MR. HANNA:  No, Judge.  Punitive damages are not

24    permitted under ELCRA.

25        THE COURT:  I thought I saw that in your complaint.

1              MR. HANNA:  It was mistakenly in there, but we have

2     since withdrawn that.

3              THE COURT:  Okay.  All right, so the compensatory

4     damages, you said loss wages and benefits.  What other

5     compensatory damages are you referring to?

6              MR. HANNA:  Well, it's the emotional pain and

7     suffering, Judge.

8              THE COURT:  Okay.  Have you, umm, are you alleging

9     garden variety emotional pain and suffering?

10             MR. HANNA:  No, Judge.

11             THE COURT:  Okay.

12             MR. HANNA:  No, Judge.  She has been suffering from

13    panic attacks ever since this.  She had prior issues, but

14    she -- it resurfaced because of this and we will have, expert

15    disclosures are due next week and that information will be

16    provided.

17             THE COURT:  Okay.

18             THE COURT:  But she also has testified with respect

19    to those issues in her deposition.

20             THE COURT:  Okay.  All right, thank you.  Umm, okay,

21    let's start, Ms. Hardy, with your motion.  You can approach the

22    podium.

23             MS. HARDY:  Thank you, your Honor.  I'd like to start

24    the same place that the Court started with respect to the scope

25    of discovery based upon the claim.  I'd like to emphasize that

1    the sexual harassment claim in this case is under the state

2    Civil Rights Act only, the Elliott-Larsen Civil Rights Act and

3    the standard under that Act is materially different than the

4    sexual harassment standard under Title 7 which is more commonly

5    seen in Federal Court and because of the limitations of the

6    Elliott-Larsen standard which is it only entails inherently

7    sexual conduct.  So it's not gender, it's not kind of related

8    bad acts that might be in broader way part of what a Title 7

9    plaintiff might claim as sexual harassment.  It has to be

10   conduct that is inherently sexual and under Michigan law, it

11   has to be conduct that the plaintiff is aware of for it to

12   impact her environment.  So in that context, that's a much more

13   narrow sexual harassment claim and the rumors that plaintiff

14   tries to kind of sweep in under sexual harassment don't belong

15   there.  They also argue under retaliation that the rumors are a

16   form of retaliation, but they do not fit as a matter of law

17   under the sexual harassment claim.

18          Another thing that is very clear in Michigan law,

19   well defined by the Michigan Supreme Court and reaffirmed by

20   other appellate courts is that if a company takes appropriate

21   remedial action upon receiving notice of a hostile work

22   environment, then there is no respondeat superior liability.

23   There would be no liability for the corporation and this is a

24   claim of co-worker versus co-worker harassment.  There is no

25   question that appropriate remedial action was taken.  The

1    plaintiff may not think in her view --

2            THE COURT:  Well, I think that that's what's at

3    issue, so --

4            MS. HARDY:  But what's not at issue is that the

5    conduct stopped and as a matter of law when the conduct stops,

6    it's effective remedial action.  So the plaintiff might not, it

7    might not be what she wanted, it might not be what some other

8    people would think is appropriate, but if it's effective in

9    stopping the conduct, it is therefore considered appropriate

10   remedial action as a matter of law.

11           THE COURT:  Well, I don't want to get into the merits

12   of the claim.  I understand your argument and I'm not

13   discrediting it.  I understand the plaintiff's argument to be

14   that the, umm, it wasn't effective in that she continued to

15   suffer from the effects of the rumors and the presumption that

16   what she was, her reports weren't true and that that

17   environment continued to affect her such that she was

18   constructively discharged.  So I do like I said understand your

19   argument.

20           MS. HARDY:  And I only bring it up because in an

21   effort to determine the appropriate scope of discovery, I just

22   wanted to make clear the limited nature of a sexual harassment

23   claim under state law and that rumors are not inherently sexual

24   conduct.  The fact that co-workers may be gossiping about her

25   and Mr. Maddox is not part of the sexual harassment claim.  I

1   mean, it wouldn't fit there as a matter of law and then with

2   re --

3          THE COURT:  Okay.  I wanted to go one by one because

4   I think that -- I do understand what you're saying in general,

5   but I think it would be helpful to actually address the

6   specific requests.

7          MS. HARDY:  All right.  Well, the first issue

8   identified in our motion concerns RFP number two and that seeks

9   all documents, all communications, you know, whether social

10  media or e-mails or hardcopy correspondences, any kind of

11  communication to and from plaintiff and Mr. Maddox and first

12  we'd contend that that is certainly relevant because we need --

13  we have a right to understand if we are going to have to

14  confront potentially if our motion is not granted on Rule 56,

15  we're going to have to confront the issue of what happened

16  between the plaintiff and Mr. Maddox.

17          She is going to tell a story that we need to be able

18  to put in context.  I mean, we know from the current text

19  messages already that they had a very complicated relationship.

20  They were close personal friends.  She exchanged numerous

21  e-mails with him in which she said I love you repeatedly and so

22  we need to understand not just what she considers to be

23  evidence of sexual harassment, but the other dimensions of

24  their relationship which would potentially explain if we were

25  ever in front of a jury what the welcomed nature was of the

1   relationship so that a jury can have an appropriate assessment

2   of what this relationship really consisted of.  We definitely

3   know there was a very welcomed nature to it.  It may have had a

4   turning point at some point in time, but we need to see all the

5   communications, the friendly communications, the, umm,

6   communications between close friends as well as the

7   communications that she considers to be evidence of harassment

8   and what plaintiff has done in the response is, first,

9   stone-walled us and give us absolutely nothing until we filed

10  this motion to compel.  After we filed the motion to compel, we

11  got roughly 200 pages of documents and we didn't receive those

12  until 24 hours before plaintiff's deposition was set to occur.

13          THE COURT:  Okay.  So I think that Mr. Hanna is

14  saying that that issue has been resolved.  Can you tell me what

15  is to the extent that you don't agree, what evidence is there

16  that you haven't received everything that is responsive to that

17  request?

18          MS. HARDY:  Yes, I will.  First if you look at the

19  response, there's a number of amended responses filed by the

20  plaintiff and if you look at the amended response 22, Mr. Hanna

21  on behalf of his client, Ms. Edwards, says that he's only

22  producing relevant documents and he doesn't define what they

23  consider to be relevant documents.  That is inconsistent with

24  his obligations under the federal court rules.  If he's

25  withholding documents, he must define the category of documents

1    being withheld.  We don't know that.  We do know from the 200

2    pages we saw and the testimony of the plaintiff at her

3    deposition that there are some things that clearly were

4    missing.  For instance, we got text messages that she produced

5    that show her messages to Mr. Maddox, but not the rest of the

6    conversation.  We don't see both sides of the conversation.  We

7    just get one portion of it.

8            THE COURT:  No, I understood her saying that she --

9    that they weren't available and I'm just wondering, I mean,

10   here's something that I want to tell you that I learned that

11   might be -- this may or may have nothing do with it, but I

12   learned that i-messages are not -- they don't go by the carrier

13   and whereas if you have a message that's going over Verizon,

14   then Verizon's going to have those messages.  So what will

15   happen is sometimes there will be gaps in conversation because

16   some of the portions of the conversation were exchanged on

17   i-message.  Did you receive these -- these were just documents

18   or text messages that she pulled from her own phone or what was

19   it?

20           MS. HARDY:  Yes, that's what she testified to in her

21   deposition that she's the one who did the search of her phone,

22   gave her copies Mr. Hanna, Mr. Hanna provided whatever he chose

23   to provide to us.  So first, we don't know whether she had the

24   skills to do an appropriate search.  We don't know if there's a

25   problem such what the Court's just identified as a potential

```
1    what could be, I don't know.  We don't know what Mr. Hanna
2    withheld from documents the plaintiff gave him because he
3    deemed them not relevant and he hasn't told us what he has
4    defined as the relevant scope of documents that he's been
5    producing.
6              THE COURT:  Now we're talking about RFP two, right?
7              MS. HARDY:  Right now we are, yes.
8              THE COURT:  Okay, so I'm seeing because his response
9    starts at seven, but, umm, let me --
10             MS. HARDY:  I'm looking at the response, the amended
11   response to the RFP two and the last sentence says subject to
12   and without waiving said objections, plaintiff shall make
13   available for inspection and copying relevant documents that
14   are responsive to this request without --
15             THE COURT:  Let me ask Mr. Hanna about that.
16   Mr. Hanna, first of all I want to just make a point that
17   neither party can determine unilaterally what's relevant, so I
18   do have a problem with you saying that you've produced relevant
19   documents and not -- and also Rule 34 requires there to be
20   specificity about what has been withheld.  Are you -- can you
21   tell me what you mean by relevant documents and what has been
22   withheld?
23             MR. HANNA:  Ms. Hardy's looking at the wrong
24   document.
25             THE COURT:  That's not -- I asked you a specific
```

1   question.

2            MR. HANNA:  I'm not -- Judge --

3            THE COURT:  Can you tell me what you have --

4            MR. HANNA:  She's looking at the first-amended

5   response.  The second-amended response doesn't have any of that

6   language.  It just said --

7            THE COURT:  Okay, it doesn't say -- because it does

8   say that with regard to RFP seven so that's why I thought that,

9   so are you saying that you are not withholding any documents in

10  response to RFP two, that you have produced all responsive

11  documents or are you disagreeing about the temporal time

12  period?  Is that the disagreement?

13           MR. HANNA:  I -- I --

14           MS. HARDY:  No, you know, your Honor, I can give

15  you --

16           MR. HANNA:  -- can clarify --

17           THE COURT:  Wait, I need one person to speak at a

18  time.

19           MS. HARDY:  I can give you numerous --

20           MR. HANNA:  If I can clarify, Judge?  I think that

21  question was directed at me.

22           MS. HARDY:  Your Honor, I thought you looked at me,

23  so I started to respond.

24           THE COURT:  I asked whether the temporal proximity

25  was and I did look at -- is the temporal proximity in dispute

1    here?

2                MR. HANNA:  Judge --

3                MS. HARDY:  Not that I'm aware of.

4                THE COURT:  Okay.  All right.  Go ahead, Mr. Hanna.

5    I see you're bursting and I don't want you bursting because

6    that's not helpful, so can you tell me whether you have

7    produced all documents responsive to RFP two?

8                MR. HANNA:  Yes.

9                THE COURT:  Umm, and, umm, so you've previously

10   produced them after July -- January 1st, 2014 and now you're

11   saying you produced all documents between the plaintiff and

12   Mr. Maddox?

13               MR. HANNA:  Judge, here's what happened.  A couple

14   days before plaintiff's deposition, defendants conferred prior

15   to filing a motion to compel.  Plaintiff responded and pointed

16   out the fact that the parties previously had an agreement with

17   a temporal scope as indicated in defendant's very own

18   documents.  There --

19               THE COURT:  You know what?  If you're going to tell

20   me the history of the dispute, I don't want to --

21               MR. HANNA:  I'm just trying to --

22               THE COURT:  -- hear the history of the dispute.  My

23   question is whether you have produced all responsive documents

24   to RFP two and you're not withholding any documents.

25               MR. HANNA:  I would just like a brief opportunity to

1    explain myself.

2            THE COURT:  No, I want a yes or no answer.  Have you

3    produced all the documents that are responsive to RFP two?

4            MR. HANNA:  Yes, Judge.  Plaintiff has produced all

5    documents in her possession, custody and control and she's also

6    testified to that in her deposition.  I can show you the

7    deposition testimony if you'd like to confirm that.

8            THE COURT:  Okay.  Ms. Hardy, why are -- on what

9    basis would I find it that he's not being honest about that?

10           MS. HARDY:  I'll give you three things.  Facebook.

11   That's included within the definition of documents in our

12   document request and so it's responsive to number two.

13   Plaintiff testified on page 47 of her deposition that she had

14   private messages on Facebook with Mr. Maddox and when I asked

15   for -- one, we've received nothing from Facebook and it's very

16   clear from the long heated dialog with Mr. Hanna on the record

17   that he has no intention of producing anything from Facebook

18   because he accused me of harassing her by asking her Facebook

19   messages --

20           THE COURT:  Okay, I just -- give me the -- so you

21   said the private discussions on Facebook?

22           MS. HARDY:  Private messages to --

23           THE COURT:  Private messages on, yeah.

24           MS. HARDY:  -- him on Facebook, page 47 of her August

25   29 deposition.  She also testified on page 53 of her deposition

1    that she had Instagram exchanges with Mr. Maddox and she has

2    produced none of those and she also said that she had Twitter,

3    a Twitter account and Twitter messages with him, that she had

4    not searched her Twitter.  So those are three examples and then

5    of course there's not only in the answers to interrogatories,

6    but in his brief he used the wording that he was producing

7    documents that reaffirm sexual, the sexual harassment she was

8    forced to endure.

9         THE COURT:  Well, I'm saying that, umm -- oh, I see

10   what you're saying, which affirm, umm --

11        MS. HARDY:  That appears to be a limitation --

12        THE COURT:  Okay --

13        MS. HARDY:  -- that he's only produced documents --

14        THE COURT:  Mr. Hanna, is that a limitation?

15        MR. HANNA:  Judge, the --

16        MS. HARDY:  -- that support --

17        MR. HANNA:  -- the full sentence says plaintiff

18   gladly produced all communications in her --

19        THE COURT:  I'm reading it.  I'm just saying that it

20   does say which reaffirm that you produced all communications

21   regardless of temporal scope which reaffirm the sexual

22   harassment she was made to endure.  That might not be what you

23   meant, but I'm trying to figure out whether you're saying that

24   you've produced all documents which to reaffirm the sexual

25   harassment or whether you've produced all documents?

1    MR. HANNA:  All documents, Judge, and for the record

2    they do have the Facebook communication.  It was one message

3    where he asked her about a Caucasian lady on his profile pic

4    and he said who's that snow hoe and that message was produced.

5    THE COURT:  Instagram and Twitter?

6    MR. HANNA:  There is no indication -- if she could

7    point out to where she said that because that was not her

8    testimony, but I'm happy to take a look at and see what Ms.

9    Hardy's referring to.

10   THE COURT:  Okay.  Can someone tell me where --

11   MS. HARDY:  Page 53 for Instagram, line six.

12   THE COURT:  Can you tell me which, where I find the

13   deposition?  I know I've seen it, but I --

14   MS. HARDY:  I'm not sure if the whole deposition's

15   been produced or not.

16   MR. HANNA:  Well, we have, that's the page and line

17   number.

18   MS. HARDY:  I can hand to the Court page --

19   THE COURT:  I'm sorry.  Whatever's been filed.  Okay,

20   I'm sorry.  Go ahead.  I see excerpts of plaintiff's deposition

21   transcript.  Do you have the full deposition transcript with

22   you?

23   MS. HARDY:  I do.

24   MR. HANNA:  I do, Judge.  It does say that for the

25   record and I did not get a chance to redirect my client and I

 1   think that was a mistake.  I think that's supposed to be

 2   Facebook.  I don't think she has anything on Instagram with

 3   Mr. Maddox.

 4          THE COURT:  Well, this is something that you'll have

 5   to confirm.

 6          MR. HANNA:  Excuse me, Judge.  I think she, umm, my

 7   co-counsel just reminded me.  She's actually referring to

 8   photos on Instagram which were produced.  Page 110.  110, 111

 9   and 112 and 113 and 114 and 115 and that's all.

10          MS. HARDY:  Well, I find what Mr. Hanna said about

11   Facebook, I mean, I don't know, I'll have to look back and see

12   if there's such a document and if we can identify it as a

13   Facebook, but he gave quite a lecture on the record to make

14   quite a point saying --

15          THE COURT:  Okay, here's the thing --

16          MS. HARDY:  -- we're not entitled to any social

17   media.

18          THE COURT:  Okay, so --

19          MR. HANNA:  Not true, Judge.

20          THE COURT:  Please don't do that.  I'm going to, umm,

21   Mr. Hanna, order you to confirm with your client that you have

22   produced all messages that she exchanged with Mr. Maddox on

23   Facebook, Instagram and Twitter and you can provide Ms. Hardy

24   with the assurances that you've done that.  If you discover

25   more of them, please disclose it.

1      MR. HANNA:  For the record, Judge, plaintiff's page

2  132 is the confidential message between Malcolm Maddox and Tara

3  Edwards where he begins umm, who's the snow hoe in your profile

4  pic and is she loose, I need a girlfriend and I need one right

5  now.  It was produced.

6      THE COURT:  Okay, so I took you at your word that you

7  have provided something and I'm saying that you should confirm

8  with the plaintiff that she has disclosed all messages on

9  social media that she had with Mr. Maddox and that you should

10  either turn over -- well, both turn over anything else that's

11  been discovered and confirm in writing that the answers are

12  complete, that the answer to that RFP is complete.

13      MS. HARDY:  Your Honor, might your order also compel

14  them to explain what they've done, too, in the search process

15  so that we can understand whether or not they have been

16  thorough in the search effort?  It was very -- it was -- I went

17  round and round with plaintiff in the deposition and I don't --

18      THE COURT:  You know, the thing is that I don't want

19  to do is rehash all these arguments because it's clear from

20  reading the briefs, it's clear from reading the portions of the

21  deposition, it's clear from when I started here that you all

22  have, umm, a lot of, umm, frustration with one another.  I want

23  to tell you while I'm on this subject, I have this theory about

24  why civil attorneys are less civil with one another than

25  criminal attorneys and my theory is that they are in

1     depositions with one another without a referee and that one or

2     the other is being obstructive and that you can really develop

3     some negative feelings.

4          Mr. Hanna, I'm going to tell you I'm not here to rule

5     on the and in fact it hasn't been referred to me, you were

6     objecting over and over again and I haven't seen all the

7     depositions and I don't know to what extent that Ms. Hardy was

8     going to do that, I don't want you to look at it and then try

9     and prove to me or have an argument with me.  I'm going to just

10    tell you that it's not productive and that when someone like me

11    is looking at it and trying to make a decision, that that's not

12    advancing your client's position, it's exhausting and that's

13    why I am going to today limit the efforts of either side to

14    rehash what happened in the past.  I'm going to try to do my

15    best to help everybody get the discovery that they need which I

16    think, you know, is within the scope of what should be

17    disclosed.  So Mr. Hanna, do you have any objection to

18    providing to Ms. Hardy a description of the efforts of the

19    manner in which you and your client searched for the

20    communication between her and Mr. Maddox?

21          MR. HANNA:  Judge, if you go to page 61 through 68 of

22    the deposition, they thoroughly went over it.

23          THE COURT:  And I'm going to need you to answer

24    questions that I ask you and not tell may what you want to tell

25    me.  I asked a very specific question; do you have any

1     objection to providing a description of the manner in which you

2     searched for the documents responsive to RFP two?

3            MR. HANNA:  I will not object so long as defendant

4     similarly answer our request for production of text messages in

5     a similar manner.

6            THE COURT:  I'm not at your motion yet so please

7     limit it to what I'm asking you because we can be here until

8     six o'clock if we keep on having to address some of these, umm,

9     get sidelined so I'm going to -- Mr. Hanna, you should also

10    provide a description in writing of what measures you took to

11    search for responsive documents.  I do want to emphasize that

12    sometimes parties get to the point where they just don't

13    believe each other, I don't believe you searched for

14    everything, but once a party has said I searched and this is

15    everything that I have, then it's not really up to the Court to

16    decide whether or not unless there's evidence that, you know,

17    that it's not truthful, so there's a limit to how much we can

18    really test how full the response is, but I, as I said, will

19    try and make sure everybody has a chance to address that.

20           So the next one --

21           MS. HARDY:  Is three.  I think we can deal with three

22    and four together if that's acceptable?

23           THE COURT:  Okay.  Let me just see.

24           (Pause)

25           THE COURT:  Okay.  So Mr. Hanna has stated that

1   plaintiff has produced all responsive documents in her

2   possession, custody or control to the RFPs as more narrowly

3   tailored and it's your position that that's not true?

4        MS. HARDY:  Well, umm, he hasn't defined what

5   self-imposed or what he's imposed as the narrowly tailored,

6   umm, scope.

7        THE COURT:  No, what I'm saying is that you, you

8   narrowed -- you tailored the request to documents regarding

9   Maddox, the father of plaintiff's child or her pregnancy,

10  sexual matters, rumors, retaliation, harassment, any complaints

11  plaintiff or others made regarding WXYZ and any document that

12  plaintiff believes reflects sexual harassment, hostile work

13  environment or retaliation and he said with no limitation

14  plaintiff has produced all responsive documents in her

15  possession, custody or control responsive to defendant's

16  categorical limitations.  So --

17       MS. HARDY:  I can give you an example of one that,

18  one I know he held back until it became clear that such a

19  documents existed and then he produced it in the middle of the

20  deposition, but it's one after he made that representation he

21  should have produced and he did not and that's Val Morris'

22  e-mail, the one that concerns -- Val Morris is a co-worker of

23  the plaintiff.

24       THE COURT:  He's the one who said that he was on the

25  phone that --

1          MS. HARDY:  They were talking about Mr. Maddox.

2          THE COURT:  And then the attorney got on the phone?

3   Is that the one you're talking about?

4          MS. HARDY:  And then she was purporting to have a

5   personal conversation with Ms. Morris and then all of a sudden

6   her attorney pops on the phone and she was very upset, she

7   thought she had been tricked and it clearly is responsive to

8   Mr. Maddox, everything concerning Mr. Maddox and, umm, you

9   know, complaints about others concerning with WXYZ.  It should

10  have been produced.  It was not.  He had it clearly.  It was

11  something he could produce at the deposition once she testified

12  it existed, but had we not had her testimony to know that it

13  existed and had I not said where's that document, we don't have

14  that, presumably we would not have received it.

15         THE COURT:  Mr. Hanna?

16         MR. HANNA:  The text message states Tara, I just want

17  you to know I feel really blindsided about all --

18         THE COURT:  I did read it, so.

19         MR. HANNA:  Okay.  So first of all, it doesn't say

20  Maddox, but I'm not even arguing the relevance, Judge.  We

21  did -- they conferred regarding the text messages on a Friday.

22  We produced everything on a Monday and Tuesday and then this

23  came up on a Wednesday.  I didn't hold anything back.  I said

24  can we take a five-minute break.  I went to see my client.  We

25  gave it to them, we produced it.  We have searched all her

1  records for messages, we've produced everything including that

2  message.

3          THE COURT:  But this, umm, the fact that that wasn't

4  included in the production and it is I think clearly related to

5  the alleged harassment leads the defense to believe that you

6  are holding documents back.  Have you done anything since you

7  discovered that there was that document and it was left out to

8  double check?

9          MR. HANNA:  She has searched her text messages and

10  she has searched her e-mails and her Facebook.  I mean, she's

11  getting to the point where she's like paranoid about it and I

12  said everything.  We have given them everything.  I know you --

13          THE COURT:  And I understand that it's overwhelming.

14  One thing that one of the, the factors in proportionality is

15  the amount in controversy and the defense is right that by

16  asking for 100 million dollars, Ms. Edwards is opening herself

17  up to a, and I'm not agreeing with everything.  I think that

18  some of these requests are too broad, but that means that Ms.

19  Edwards is going to be burdened, not necessarily unduly

20  burdened, but I think that it does make sense to order you to

21  provide the same sort of description in writing, first of all

22  the assurance that, you know, to check with Ms. Edwards, make

23  sure that she has produced everything and to provide the

24  defense with and this is for RFP three and four, right?

25          MS. HARDY:  Correct.

1        THE COURT:  The same thing, description of the

2    efforts taken to search and confirmation that you produce

3    everything and of course Mr. Hanna, to the extent that you had

4    that document in your possession, you need to check to make

5    sure that Ms. Edwards hasn't turned over anything to you and

6    that you neglected because you, not necessarily purposely, but

7    you didn't turn that over so do you understand that?  Okay.

8    All right, so that takes us to five?

9        MS. HARDY:  Yes, your Honor.  That concerns the issue

10   of whether all e-mails that she forwarded from her work address

11   to her personal e-mail address have been turned over.

12       THE COURT:  But I thought that she said that she had

13   turned everything over to her, that she sent to her personal

14   e-mail address, but you want her to disclose anything that she

15   sent from her work address to third parties.

16       MS. HARDY:  Yes, we do, your Honor, and --

17       THE COURT:  But how do you get to the within the

18   possession, custody and control if these aren't documents that

19   she forwarded to third parties and I'm going to say something

20   else about is this that you said that it might show that she

21   was forwarding documents inappropriately or in violation of the

22   company policy.  That's not at issue so --

23       MS. HARDY:  I don't believe we said that.  That's the

24   theory plaintiff has as to why our motivation for seeking those

25   documents is improper.  We're not looking for violations of

1    company policy, we're looking for communications that --

2            THE COURT:  I'm reading from your brief.  It says it

3    could include materials that plaintiff deleted from her work

4    e-mail, it might also show that plaintiff was forwarding WXYZ

5    documents outside of the company inappropriately or in

6    violation of the company policy.

7            MS. HARDY:  Well, if that's indeed what it says,

8    that's not our purpose and I, umm, I withdraw that.  The

9    purpose is to find out what communications she has had with

10   potential witnesses and what we don't think she's done to date

11   is search her sent box on her personal e-mail to confirm what

12   she had, may have forwarded from her personal e-mail to third

13   parties who could be witnesses in this case.

14           THE COURT:  But it says, the request is documents

15   that she sent from her e-mail address to her personal e-mail

16   address or any address outside of defendant's e-mail system, so

17   what I understood her to say is that she searched her personal

18   e-mail address and I understood you to be asking for documents

19   that she might have sent to a third party.  I really don't see

20   any evidence that she sent documents -- that you have any

21   specific evidence that she sent something to a third party, but

22   I also don't know how I would find that documents sent to a

23   third party are without her possession, custody or control

24   without more of a foundation.

25           MS. HARDY:  Well, you know, she could send e-mails

1    directly from the work address to a third party or she could

2    take an indirect route and send them from her work e-mail to

3    her personal e-mail and then to a third party.  We're

4    interested in --

5            THE COURT:  That's not what I see the request saying

6    though.

7            MS. HARDY:  Well, I would, you know, my argument is

8    is that it's encompassed within -- we want to know what's been

9    sent from her work e-mail, whether it went directly from there

10   or whether it first went to the personal e-mail and then to a

11   third party.

12           THE COURT:  But if she produced whatever she sent

13   from her work e-mail to her personal e-mail, then that would

14   capture whatever she forwarded from her personal e-mail to

15   someone else if it came from the work e-mail and went to the

16   personal e-mail.

17           MS. HARDY:  We wouldn't necessarily know the category

18   of documents though that she sent on to a third party just

19   because she produces what went from the work to the personal,

20   so then the last point of inquiry is of that category of

21   documents that went to her personal e-mail from the work, which

22   ones did she forward on to third parties.

23           THE COURT:  Does that say that in the request?

24           MS. HARDY:  It does not expressly say that, no.

25           THE COURT:  Well, then I'm not going to order them

1    to -- I'm not going to compel them to produce something that

2    wasn't requested.

3           MS. HARDY:  I think it's encompassed in, inherently

4    encompassed because it's a just an indirect way of doing it,

5    but it does not expressly say that, so I --

6           THE COURT:  But, I mean, if they produced what was

7    sent from her work e-mail address to her personal e-mail

8    address, then I think that that exhausts what I can assume is

9    in her possession, custody and control.  Now if you're saying

10   that you want to find out what she shared with third parties,

11   that's not what that request says and I don't think that it's,

12   it's assumed, it can be assumed.

13          MS. HARDY:  Okay.  We can file an additional request

14   to cover that.

15          THE COURT:  Okay, so I'm going to deny the motion to

16   compel anymore answers to that one.  So number seven, I think

17   that number seven doesn't include any -- this is

18   extraordinarily broad to me.  All notes, whether plaintiff

19   identified or anonymous of any conversation between any

20   employee and so this is one of those reasonably calculated to

21   lead to admissible evidence, but not tailored to address a

22   claim or defense.

23          MS. HARDY:  What specifically led to this one, your

24   Honor, was in her complaint to HR, she -- her written complaint

25   to Barb Roethler which then went to HR, she expressly said in

1    that document that she had other notes to support her claim.

2          THE COURT:  But that's not what this requests.

3          MS. HARDY:  It would be encompassed within that.

4          THE COURT:  But what I'm saying is you need to narrow

5    it to, you need to tailor it to that, you know, documents to

6    support her claim or, you know, if you narrowed it like you did

7    the, umm, the ones in three and four --

8          MS. HARDY:  Um-hmm, you mean to the docket --

9          THE COURT:  -- I mean, this is just any note, any

10    posted note, any, you know, hey, meet you at seven, and so --

11          MS. HARDY:  I understand your point and we will file

12    a subsequent request to narrow it.

13          THE COURT:  Okay.  I'm wondering to some extent with

14    some of these that I think on both sides I think need to be

15    narrowed, to what extent -- I mean, instead of going back and

16    forth with more discovery requests, you could sit down and meet

17    and confer and try and agree on a scope.  I have already said

18    that I realize that there's frustration on both sides, but I

19    think that that could be more expeditious than filing another

20    request for production of documents and then, you know, and I

21    will say the boiler plate objections, people, everyone still

22    files them, but they are totally meaningless and really the

23    amendments to Rule 26 were intended to eliminate those boiler

24    plate objections and for just and especially the subject to,

25    but without waiving said objection, I'll provide you with

1    documents, but I'm withholding some others, you know, there's

2    supposed to be a real clarity about what is being produced and

3    what's being withheld and the boiler plate objections, I've

4    just never seen them have any impact whatsoever on a judge's

5    decision.  In fact, a lot of the -- there's plenty of case law

6    that says that reliance on those boiler plate objections acts

7    as a waiver of any objection at all because they're

8    meaningless.  So instead of having you submit new requests and

9    Mr. Hanna submit his new request and the parties exchange

10   boiler plate objections and, I'm just wondering whether you

11   think it would make sense to and I'll ask this of both of you

12   you, to take some of these under advisement because I think

13   that there's a more, there's a narrower request within this

14   request that would be proper and then to come back and try and

15   address any objections after you all have met and conferred.

16        MS. HARDY:  That makes sense and we will make that

17   effort.

18        THE COURT:  Mr. Hanna, is that something that you

19   would agree to?

20        MR. HANNA:  Sure.

21        THE COURT:  Okay.  So I'll take seven under

22   advisement.

23        MS. HARDY:  And 19 I think we covered in conjunction

24   with RFP two.  My Space and YouTube was not covered, but on the

25   other hand I haven't asked her whether there is anything in

1    conjunction with My Space and YouTube so I don't, I'm not in a

2    position to say anything's missing.

3          THE COURT:  Well, yeah and I do have a concern about

4    19.  I do think that it is, it's from, you know, eight years

5    and it seems like, you know, and I don't know when you say

6    plaintiff's emotional state, I also didn't know what that

7    meant, you know, a smiley face next to somebody's, umm, an

8    emoji smiley face?  I think to the extent that it is regarding

9    plaintiff's employment with WXYZ or, umm, and the photographs,

10   you say plaintiff's, photographs of plaintiff in which either

11   her or current or former employees at WXYZ.  Is that like every

12   picture of her?

13         MS. HARDY:  That she has in her possession that

14   might, umm, you know, we have a constructive discharge charge

15   claim here so it's not just sexual harassment retaliation and

16   her complaint was investigated and resolved in January or

17   February of '15; she didn't resign until December 31, '16.  So

18   what's going on between her and other employees?  Photos tell

19   you a lot about her work environment.

20         THE COURT:  But this isn't limited to that relevant

21   time period and some young people take, you know, a selfie

22   every hour or more.  They take -- so I'm not sure how

23   meaningful a photograph, eight years of photographs would be.

24   It does -- and this is not limited to photographs of her with

25   any former employees at WXYZ, it's any photograph of her.

1    MS. HARDY:  Well, it's any photograph that plaintiff

2  has posted in which either plaintiff or current or former

3  employee appear, so they obviously --

4    THE COURT:  You should see my nephew's Twitter feed,

5  okay?  It's ridiculous and I'm just giving an example -- don't

6  tell him I said that about him, but he -- you just -- I don't

7  know whether she is one of those people who takes a photograph

8  every hour.  I don't know how probative it would be of her even

9  smiling because I don't think that people are necessarily

10 trying to display, you know, any bad feelings they're having as

11 they take a million photographs of themselves.  I would suggest

12 that you all talk about RFP 19, but I will tell you that this

13 is much too broad to me.  It does have the markings of a

14 fishing expedition and the scope seems to be --

15    MS. HARDY:  We're just trying to get a picture of her

16 workplace environment and relationships and I certainly take

17 your point about limiting the time period, but from the time

18 that she claims that it became so intolerable that she was

19 compelled to resign her employment, it is relevant to see what

20 kind of exchanges she's having with her colleagues and her

21 friends at work to get a --

22    THE COURT:  That's not what this requests though.

23    MS. HARDY:  Well, it --

24    THE COURT:  This doesn't request between her

25 colleagues and friends at work during that period of time.

1        MS. HARDY:  It covers her employment, it covers her

2    mental emotional state, umm --

3        THE COURT:  And again, I don't know what that means.

4    I don't know whether that means every emoji with a smiley face

5    and I just don't know how probative any of that would be.  I

6    don't see any evidence that showing her taking a smiling emoji

7    would be evidence that she actually is not suffering at work,

8    so I do think that this is, umm, that there are relevant

9    documents or there are -- there could be relevant information

10   within the social media, especially if she's posting things

11   regarding her employment at WXYZ or with current or former

12   employees, photographs with her and employees at WXYZ or at

13   WXYZ.  I don't know if she took any at work --

14       MS. HARDY:  I don't know either, umm --

15       THE COURT:  -- but every dinner that she has with her

16   family, every --

17       MS. HARDY:  This doesn't, I don't think it covers

18   personal.  I mean, it's related --

19       THE COURT:  Photos of plaintiff.

20       MS. HARDY:  Well, photos of plaintiff regarding her

21   employment with defendant or relating --

22       THE COURT:  That's not what it says.  It says photos

23   plaintiff has posted in which either her or employees of WXYZ

24   appear.  So that would be --

25       MS. HARDY:  Well, yeah.  I mean, I consider that work

1    related because it's with an employee.

2         THE COURT:  Well, no.  It says either her or

3    employees, so it's every picture of her within the last eight

4    years.

5         MS. HARDY:  I, I see your point and I agree with

6    that.  I did intend that, but that's sloppy wording, so.

7         THE COURT:  But if you're saying pictures with her

8    and an employee or regarding her employment and Mr. Hanna, you

9    can pipe in here in you'd like about what you think the scope

10   of what would be relevant on social media would be.

11        MR. HANNA:  Yeah, I mean, Judge, we produced her

12   Facebook message with a perspective employer.  We've produced

13   several pages where she was anchoring on the desk.  They

14   encouraged her to get out there on social media and post all

15   these pictures where she's on the desk anchoring.  We've

16   produced all that.  We've produced, umm, she's only had one

17   message, like, communication with Malcolm.  That was the snow

18   hoe one we referenced.  We've produced that.  We've produced it

19   and as your Honor said that this request is not proper.

20        THE COURT:  Have you searched for photographs of her

21   with current or former employees at WXYZ and -- well, I'll just

22   ask you that general.

23        MR. HANNA:  Have we searched any, all of her pictures

24   on all of social media for any -- what we've produced and what

25   we've searched for are pictures that we thought were relevant

```
 1     to her employment which would be pictures with her on the
 2     anchor desk.  Does she have a random picture with one of her
 3     employees somewhere?  I, I don't know.  I mean, the search is
 4     so overbroad and --
 5              THE COURT:  Well, I'm trying to narrow it, but I
 6     don't think it's and I certainly don't know how many
 7     photographs that she has with, you know, on any of that social
 8     media in general.  If it's overly-burdensome though, it's your
 9     job to show it.  It's your burden to show that.
10              MR. HANNA:  I would argue, Judge, that it's not
11     relevant.  Even if she had a picture with one of her random
12     co-workers in 2011, I don't see how that's remotely relevant.
13              THE COURT:  I agree 2011 is too, it's too early.
14              MR. HANNA:  Even if she had a picture with her
15     colleague in --
16              THE COURT:  Unless it's with Mr. Maddox of course,
17     but during the time period in which she's saying that she
18     was -- when did she say that the sexual harassment began?
19              MS. HARDY:  2012 through July, 2014 was the period.
20              MR. HANNA:  That's not correct.  It was until her
21     constructive discharge in 2016, but --
22              THE COURT:  Okay, so she was saying she was sexually
23     harassed, so I think that any photographs, any evidence in her
24     social media connected to her work is relevant.
25              MR. HANNA:  Well, for the record, Judge, we've
```

1    produced all pictures she has with Malcolm.

2         THE COURT:  No, that's not what I said though.  I

3    understand that you said that, but I think that messages about

4    her employment from 2012 to 2016, I think that that is

5    relevant.

6         MR. HANNA:  What does that mean about her work?  Hey,

7    what's up with this assignment?  Oh, are you going to next

8    week?  Okay, fine, see you later?  I mean, there could be

9    thousands of that type of communication.

10        THE COURT:  Well, but you haven't provided that.

11        MR. HANNA:  Well, I don't know what they're asking

12   for quite frankly.  Their request is so overbroad, it's not

13   even based on search terms, it's categorical, so for us to

14   complete their whole search, we would literally have to review

15   every thing she's ever done on social media.

16        THE COURT:  You can actually do search terms on

17   Facebook by the way.

18        MR. HANNA:  The search terms search though.  This is

19   a categorical search.

20        THE COURT:  In terms of WXYZ, Channel Seven, you

21   could actually do that --

22        MR. HANNA:  Yeah, we would be willing to do --

23        THE COURT:  -- but there are, there are relevant,

24   umm, I do think that as written, this request is overly broad,

25   but I think that as you're saying, it's too narrow and so I'm

1  trying to find --

2       MR. HANNA:  Yeah, I mean, I couldn't -- as far as the

3  overbroad analysis, Judge, because it's not a search term

4  search, I can't come back and tell you well this produces 5,000

5  hits and therefore I can't search it.  I don't know how many

6  hits it would provide because it's not based on search --

7  because it's based on categories, you'd literally have to

8  review everything.  You can't just say the word sex and

9  whatever appears in sex, you'll review that to see if it's

10  relevant because it's --

11       THE COURT:  But you haven't provided any information

12  about how challenging that would be.

13       MR. HANNA:  Because I can't, I don't know what their

14  search is because it's not -- I mean, we're --

15       THE COURT:  But you're saying she would literally

16  have to go through eight years and I don't know, I don't know

17  what that means.  Does that mean that it will take her, you

18  know, a week to look through it?  There's no information about

19  that and the fact that it causes, again I think Ms. Hardy is

20  right.  She is suing for 100 million dollars and so that

21  proportionality factor is, you know, is big.  The fact that

22  this is a civil rights case and it has a fee shifting because

23  under Elliot-Larsen there's the fee shifting, isn't there?

24       MS. HARDY:  Yes.

25       THE COURT:  So that again, that makes -- these are

1   things that cause, indicate that discovery can generally

2   speaking be more expansive than some other cases and, umm, the

3   parties' relative access to information.  She has it, the

4   defense doesn't, so in terms of you saying it will be, you

5   know, work for her, I'm not surprised, but at the same time if

6   there are Facebook messages or Twitter tweets and they reflect

7   her discussing her employment, at least, you know, and I would

8   say, you know, more likely during the period of, the complaint

9   was made in 2015?

10          MS. HARDY:  The complaint was made in '15 and she

11  claims that the harassment occurred, started in 2012 and she

12  resigned December 31, 2016.

13          THE COURT:  So we're actually talking if it's 2012 to

14  2016, that's four years of, umm, and what's the relevance of

15  asking for to the present?

16          MS. HARDY:  Well, it wouldn't be to the present

17  'cause she left in '16, so.

18          THE COURT:  Okay, I'm just trying to figure out

19  whether that was your intention.

20          MS. HARDY:  And again I do think that the

21  constructive discharge claim puts, you know, that is a much

22  broader claim and than just the issues of sexual harassment

23  between her and Mr. Maddox.  That concerns the work environment

24  as a general matter because she did testify, your Honor, that

25  she -- she never even talked to Mr. Maddox after the resolution

1    of her complaint.  She had no further issues with him.  The

2    only thing she said he did was walk by and she thought, you

3    know, he was lording over her by walking by her workstation,

4    but that was the extent of her contact.  After the resolution

5    of her complaint, her issue is that there was gossip going on

6    in the workplace about who the father was of her baby and

7    whether it was Mr. Maddox because she, she was pregnant without

8    being married and there'd been this relationship she'd had with

9    Maddox which was unusual and people were speculating as to who

10   the father was.

11           THE COURT:  Well and I understand that she's said

12   also and just to say that because of the alleged insufficient

13   punitive measures that it gave and the sonneting (phonetic) of

14   her gave the impression that the allegations of sexual

15   harassment that she had made were not true and that the things

16   that Mr. Maddox had said were true so I do understand that and

17   again I'm not trying to decide the merit of it.  So I, umm, do

18   you, Ms. Hardy, do you have something that could when you say

19   regarding plaintiff's mental or emotional state, I think that

20   that is just way too broad.  I mean, I don't know what that, I

21   don't know how to narrow that down.

22           MS. HARDY:  Well, we, I mean, what it's referring to

23   is comments that she's made about, you know, panic attacks,

24   depression, sleeplessness that either relate to --

25           THE COURT:  Okay, so if she has a thing about panic

1    attacks, depression --

2            MS. HARDY:  Well --

3            THE COURT:  -- sleeplessness.

4            MS. HARDY:  I mean, we don't know, she says she has

5    for instance panic attacks and that that's her primary symptom,

6    but we don't know whether those are related to the stresses of

7    raising a child as a single mother with a father who's not in

8    the picture --

9            THE COURT:  Well, that doesn't have anything to do

10   whether or not it's on Facebook.  I mean, I just think that

11   relating to her mental or emotional state is just much too

12   broad.

13           MS. HARDY:  But we can come up with search terms.  We

14   are, I mean, if that would help narrow the scope in a way that

15   would, umm, satisfy the Court's concern about it not being too

16   broad, we're happy to try to work that out with Mr. Hanna.

17           THE COURT:  That's fine, but I will say that to the

18   extent that they're just generic like excited, happy, you know,

19   disappointed, I think that that can just be a slippery slope

20   and that people can be happy because they, you know, got their

21   favorite ice cream or disappointed because they went to the

22   store and it was closed before they got there, so I think that

23   in terms of the mental or emotional state, unless it's

24   something very specific about panic attacks, depression,

25   sleeplessness, things that you're saying --

1          MS. HARDY:  Um-hmm.  We'll keep it in that range.

2          THE COURT:  -- I think that otherwise what someone

3   posts on social media isn't probative of whether they were,

4   umm, they are having a, umm, they have an emotional distress

5   claim.

6          MS. HARDY:  Well, what I would suggest if the Court

7   wants to incorporate terms into the order would be depression,

8   sleeplessness, panic attacks, anxiety, any reference to

9   medication for those conditions, umm, crying, that that's been

10  a symptom she's identify where she'd have bouts of --

11         THE COURT:  Well, we don't mean this means crying

12  emojis, those laughing, crying emojis or anything like that.

13         MS. HARDY:  Well, no, I'm not referring to an emoji.

14  I don't know if -- I don't think it covers emojis.  No.  You

15  know, bouts of crying.

16         THE COURT:  Mr. Hanna?

17         MR. HANNA:  I mean, she testified in her deposition

18  that she's -- I never was one to divulge my personal life or

19  anything about myself on social media.  First of all as far as

20  telling co-workers anything about my personal business, that's

21  not something I have, I've made a habit of doing.  I don't

22  volunteer a lot of information about my personal life.

23         This is a complete fishing expedition, Judge.  They

24  have no evidence that any of this stuff would be relevant.

25  Umm --

1          THE COURT:  Okay.  Well --

2          MS. HARDY:  And it would come back with nothing.

3          THE COURT:  -- as I said, I do find that evidence in

4     social media can be relevant as long as it's narrowly tailored

5     and I understand you're saying it would be a lot, but there's

6     no evidence to how, you know, in fact I don't even know what

7     social media she uses.

8          MS. HARDY:  We know she uses Facebook, LinkedIn,

9     Twitter and Instagram.  I don't know about My Space and YouTube

10    because I haven't asked yet.

11         THE COURT:  And YouTube, are you talking about like

12    videos of herself?

13         MR. HANNA:  If I may, Judge, we would -- I think we

14    would be okay with those search terms if they are from that

15    limited time period and, you know, between her and the

16    custodians that defendant has already requested for.

17         THE COURT:  Between her and the custodians?  What are

18    you talking about?

19         MR. HANNA:  Well, I mean, you have to identify who

20    the custodians are that you want us to search for responsive

21    documents.

22         THE COURT:  I thought that she would be the

23    custodian.  She would be searching her own.

24         MR. HANNA:  Well, between her and who?

25         THE COURT:  I'm talking about posts.

```
1              MS. HARDY:  Yeah.

2              MR. HANNA:  So like if she ever post -- like so if

3    she went to a random page where it has a baby in a third-world

4    country dying and she's like wow, that makes me really

5    depressed, that's what you'd want?  I mean, that's going to

6    require a search of her entire social media platform as opposed

7    if you limit it between her and Jane Doe, then we could go to

8    her messages.

9              THE COURT:  Well, that's not what posts are though.

10   Posts are just to all your friends.

11             MR. HANNA:  Okay.  Yeah, we would be willing to those

12   search terms for her page.

13             THE COURT:  So panic attacks, depression,

14   sleeplessness, anxiety, medication and crying?

15             MR. HANNA:  Yep, for her page and for, from like a

16   very limited time period, not for eight years.

17             THE COURT:  No, I said 2012 to 2016.

18             MR. HANNA:  Well, if anything, Judge, it should be

19   from 2014 -- strike that, from 2015 after the complaint until

20   her constructive discharge because they're saying that --

21             THE COURT:  Well, but she's saying that -- I think

22   that it does go back to any, you know, affects of the --

23             MS. HARDY:  Of the alleged harassment?

24             THE COURT:  Right.

25             MR. HANNA:  Fair enough, Judge.  That's fine.  We
```

 1    don't object to it.  So for the record, it would be from 2012

 2    until her constructive discharge in 2016, correct?

 3              THE COURT:  Right.  Okay, so --

 4              (Pause)

 5              THE COURT:  Interrogatory number two, Mr. Hanna, I'm

 6    not understanding your objection to providing at least a

 7    preliminary breakdown of your allegations of damages.

 8              MR. HANNA:  Well, the only thing could you really

 9    break down, Judge, is her economic damages.  You can't break

10    down your --

11              THE COURT:  Yeah.

12              MR. HANNA:  -- so for the --

13              THE COURT:  Well, no.  I mean, people break down when

14    they come to settlement conferences this is how much I'm saying

15    I get for my emotional distress.

16              MR. HANNA:  Oh, right.  You can say this much for

17    economic --

18              THE COURT:  But your economic damages, why can't you,

19    as I said, at least provide some sort of preliminary, the

20    theory of your damages?

21              MR. HANNA:  Oh, I mean, clearly the vast majority of

22    that is not -- oh, you said economic damages, excuse me.  We --

23              THE COURT:  No.  I said the theory of your damages,

24    period.

25              MR. HANNA:  Would you repeat your question, Judge?  I

1   want to make sure I --

2          THE COURT:  I don't know why you can't provide at

3   least a preliminary breakdown of the theory of your damages.

4          MR. HANNA:  I believe we have done that.

5          THE COURT:  No because there's no economic damages.

6   There's no description of -- from what I understand Ms. Edwards

7   has another job?

8          MR. HANNA:  Okay, so you're talking about the

9   economic damages.

10         THE COURT:  No, I'm saying the damages.  I'm saying

11  that she's alleged damages and when I -- I mean, a settlement

12  conference, there will be, you know, this is how much we're

13  asking for in damages in total and there's the economic

14  damages.  There's emotional distress.  There's attorney's fees.

15  There's, you know, there are different categories and I'm

16  asking you why you can't provide at least a preliminary

17  understanding that there's a continuing duty to supplement and

18  as you learn new information, you could supplement or refine,

19  but why can't you provide at least a preliminary breakdown of

20  where you see damages?

21         MR. HANNA:  So the economic damages is dependent on

22  her back wages and the benefits information.  Under Rule 33(d),

23  we've produced her tax records for her subsequent year of

24  employment so they have her compensation --

25         THE COURT:  Yes, but at the same time you'll send it

1    to your economic expert and your economic expert will say, you

2    know, this is how much she'll lose over her lifetime.

3    There's -- it's not just a matter of providing the tax

4    documentation, it's a matter of providing your theory of what,

5    of how, umm, she will ask for damages, that breakdown.

6            MR. HANNA:  I, I believe we have sufficiently

7    responded with the information we have.  We've requested her

8    benefits information so we can recreate that and give her --

9    and give them an exact amount as far as economic damages which

10   is the only thing that could really be quantifiable.  The rest

11   is going to be up to the jury and we haven't received that

12   information.

13           THE COURT:  But you have her, her income from when

14   she worked at WXYZ.  You have her income now.  You can address

15   whether you think that her, umm, you said that this is, you

16   know, effects her -- this is taking away her dream.  To what

17   extent this has impacted her ability to get the type of work

18   that she wants to get, some, some breakdown, some explanation

19   of, of the damages other than Mr. Fieger got these big verdicts

20   before because when Mr. Fieger went to the jury and he asked

21   for these verdicts, he had a breakdown.

22           MR. HANNA:  Right.  No, I understand, Judge.  I mean,

23   I can if you're looking for something that says X amount for

24   compensatory damages, X amount for back wages.

25           THE COURT:  Yes.

1        MR. HANNA:  That's fine.  I mean, as far as -- that's

2   fine, Judge.  We can do that.

3        MS. HARDY:  And how plaintiff would calculate future

4   wages.  We don't know whether she's contending she would have

5   been like the lead anchor or the general manager of a news

6   station or what, what her future would have held had she

7   supposedly not been constructively discharged, so how she's

8   calculating what future wages would be.

9        MR. HANNA:  I don't object to that, Judge.  That's

10  fine.

11       THE COURT:  Okay.  I believe is that everything

12  for -- okay.  All right, then let's go to --

13       MR. HANNA:  Judge, do you have a minute to swear in

14  my co-counsel?  I think we called chambers about that.

15       THE COURT:  Oh, did you?

16       MS. MURTHY:  If it's not on the agenda, I'll just run

17  down to the clerk's office.  It's not a problem.

18       MR. HANNA:  We can --

19       MS. MURTHY:  It was -- I thought we were doing it

20  here because that's what the office had told me, but I'm also

21  happy to do that.

22       THE CLERK OF THE COURT:  They -- I don't know if you

23  talked to the clerk's office, but they did not tell me that.

24       MS. MURTHY:  Okay.

25       THE COURT:  The reason why that's -- I don't have any

1    problem with it theoretically, but I don't have the oath.

2             MS. MURTHY:  I, I have all the documentation in front

3    of me, but I, again, I don't want to delay these proceedings so

4    if it wasn't on the agenda, I think I can just go to the

5    clerk's office now and do it.

6             THE COURT:  You have the oath?

7             MS. MURTHY:  Um-hmm.  I have it?

8             THE COURT:  Yes.

9             (Pause)

10            THE COURT:  Okay, no.  I just, now that I have this,

11   raise your right hand and repeat after me.  I.

12            MS. MURTHY:  I.

13            THE COURT:  Angeli Murthy.

14            MS. MURTHY:  Angeli Murthy.

15            THE COURT:  Do solemnly swear.

16            MS. MURTHY:  Do solemnly swear.

17            THE COURT:  Or affirm.

18            MS. MURTHY:  Or affirm.

19            THE COURT:  That I will conduct myself.

20            MS. MURTHY:  That I will conduct myself.

21            THE COURT:  As an attorney and counselor.

22            MS. MURTHY:  As an attorney and counselor.

23            THE COURT:  Of this Court.

24            MS. MURTHY:  Of this Court.

25            THE COURT:  With integrity and respect.

1           MS. MURTHY:  With integrity and respect.

2           THE COURT:  For the law.

3           MS. MURTHY:  For the law.

4           THE COURT:  That I will have read.

5           MS. MURTHY:  That I will have read.

6           THE COURT:  And abide by.

7           MS. MURTHY:  And abide by.

8           THE COURT:  The civility principles.

9           MS. MURTHY:  The civility principles.

10          THE COURT:  Approved by this Court.

11          MS. MURTHY:  Approved by this Court.

12          THE COURT:  And that I will support and defend.

13          MS. MURTHY:  And that I will support and defend.

14          THE COURT:  The Constitution and laws.

15          MS. MURTHY:  The Constitution and laws.

16          THE COURT:  Of the United States.

17          MS. MURTHY:  Of the United States.

18          THE COURT:  I declare under penalty of perjury.

19          MS. MURTHY:  I declare under penalty of perjury.

20          THE COURT:  That the foregoing is true and correct.

21          MS. MURTHY:  That the foregoing is true and correct.

22          THE COURT:  All right.  I will sign this.  Today is

23    the 13th.  Okay.  All right, so does that mean that Ms., is it

24    Murthy?

25          MS. MURTHY:  Yes.

1          THE COURT:  Is Ms. Murthy arguing?

2          MS. MURTHY:  I am not arguing today and would like to

3     enter my appearance.

4          THE COURT:  Okay.

5          MS. MURTHY:  Thank you, your Honor.

6          THE COURT:  All right.  So Mr. Hanna, we're going to

7     start with the sexual harassment investigations involving

8     Mr. Maddox and Mr. Murri.

9          MR. HANNA:  I believe the first item was the general

10    objections part.

11         THE COURT:  I know.  You want me to strike the -- I

12    told you the boiler plate objections are, I already said that I

13    don't know what would be --

14         MR. HANNA:  Well, the big issue, Judge, is not

15    documents that they're now claiming is attorney/client

16    privilege was never in the privilege log and some of them could

17    have --

18         THE COURT:  That's a specific objection.  I was going

19    by the, umm, I think that the request to strike boiler plate

20    objections is not something that is going to make a difference

21    so I was going to in the order of your motion and the first

22    thing was discovery concerning all sexual harassment

23    investigations that involve Mr. Maddox and Mr. Murri.  This is

24    one I'm confused about is the relevance of other sexual

25    harassment investigations and comparators, how does that fit in

1    this case?

2           MR. HANNA:  Well, the case law says it's discoverable

3    first of all and --

4           THE COURT:  For what type of case and that's why I

5    tried to focus on the claim and defense here.  Your claim is

6    that she was sexually harassed and that she complained, there

7    was insufficient consequences to Mr. Maddox, she -- and she was

8    retaliated against, not that she was treated differently than

9    similarly-situated men and so how do you get to comparators in

10   this type of sexual harassment claim?

11          MR. HANNA:  So because he was a star anchor,

12   defendant did not take effective remedial measures so as far as

13   third-party investigations to see to be able to compare the

14   sexual harassment that was alleged there and what, umm, what

15   measures the company took in comparison with what happened here

16   and what they did with Mr. Maddox as far as, so that's

17   third-party investigations not involving Mr. -- or actually

18   we're only talking about the ones involving Mr. Maddox.  So as

19   far as the ones involve --

20          THE COURT:  No, you actually said anything that

21   Mr. Murri has investigated, everything at Scripps.

22          MR. HANNA:  Right, so as far as the ones that

23   Mr. Murri investigated, that's why they would be relevant, you

24   know, to be able to compare how Mr. Murri handled

25   similarly-situated sexual harassment investigations not

1    involving a star anchor in comparison to what happened with the

2    star anchor will help demonstrate the fact that they did not

3    take effective remedial measures, they did not abide their

4    progressive disciplinary policy.  As far as prior complaints

5    alleged against Mr. Maddox, I think the fact that he has a

6    history of sexually harassing women and the company was aware

7    of that is highly relevant and clearly discoverable.

8              THE COURT:  Those are two different things.

9              MR. HANNA:  Okay.

10             THE COURT:  Let me ask you, Ms. Hardy, to first

11    address whether there are other and Mr. Hanna has represented

12    that Mr. Maddox was accused of sexual harassment before Ms.

13    Edwards made that complaint.

14             (Pause)

15             MS. HARDY:  The answer's no, to our knowledge.  There

16    was not a complaint that in, that was -- but, that went to HR.

17    I mean, people can grumble between each other.  I'm not

18    including that kind of situation, but no formal internal

19    complaint.

20             THE COURT:  Well, let me rephrase it.  Was there an

21    investigation of sexual harass -- any other investigation of

22    sexual harassment allegations involving Mr. Maddox other than

23    Ms. Edwards'?

24             MS. HARDY:  No.  No.  Not -- no, at the time she

25    complained, she was the first complaint and there were other

1    women in the course of that investigation who said I heard him

2    say this or that, but it did not develop into a separate

3    investigation because none of them asserted a complaint.

4            THE COURT:  Did you -- have you disclosed the

5    statements by other people about Mr. Maddox and allegations

6    that he was engaged in sexual harassment or said things that

7    were, umm, that create --

8            MS. HARDY:  We have disclosed the full investigatory

9    file related to the plaintiff's 2015 complaint.  The only issue

10   in contention that I'm aware of is that in 2017 in December,

11   Reverend Rideout had a press conference that was heavily

12   covered on Fox News in which he tried to drum up again issues

13   about Malcolm Maddox even though the last complaint about him

14   had been the plaintiff in 2015.  So nearly two years later,

15   Reverend Rideout has this press conference that generates press

16   coverage and at that point in time one of the lawyers with

17   Scripps sent out a message to people saying if anyone has had

18   an issue with Malcolm Maddox since Tara Edwards' complaint,

19   please, please come forward and that's so she looked into it.

20   It had nothing to do with Tara Edwards because she was gone

21   from the station as of December, 2016.  It was trying to find

22   out if there's anybody else who had a complaint.

23           THE COURT:  Were there statements, witness statements

24   given at that time?

25           MS. HARDY:  No.

1          THE COURT:  So no one provide any -- when the, umm,

2    when the notices went out that these attorneys will be here and

3    if anyone wants to talk, we're available to talk?

4          MS. HARDY:  There were three people who came forward

5    and talked to the lawyer as part of her investigation and she

6    took notes and that's to my understanding the only thing that

7    would be considered a, a file.  She was --

8          THE COURT:  Have you disclosed the notes that she

9    took regarding the statements made by those three individuals?

10          MS. HARDY:  No we have not because we've asserted the

11   privilege because it was part of the legal department

12   investigation to find out if there was any ongoing problem with

13   Mr. Maddox that could create potential legal liability.  She

14   was doing it on behalf of the legal department.

15          THE COURT:  So I understand that the advice that she

16   gave would be covered by the attorney/client privilege.  Why

17   wouldn't the statement, any factual statements that are made,

18   why wouldn't those be discoverable?

19          MS. HARDY:  Well, they weren't witness statements,

20   they were notes of a lawyer and her impressions created as a

21   result of interviewing three people.

22          THE COURT:  I'm not talk -- I don't mean her

23   impressions, I'm talking about the substance of what they said.

24          MS. HARDY:  I don't think you can separate when a

25   lawyer's taking notes, separate the facts from her impressions

1    because she's drawing conclusions as she's listening to these

2    people to determine whether or not she's hearing anything that

3    would suggest that there has been conduct that would create

4    legal liability and I --

5                THE COURT:  Now I think that you can separate those.

6    I think that you can separate what the third party said to the

7    lawyer and the impressions that made on the lawyer.

8                MS. HARDY:  I think that's covered by the Upjohn

9    case, the U.S. Supreme Court case that when there is an

10   investigation conducted by the lawyers to determine potential

11   legal liability, when you're interviewing witnesses for the

12   purpose of obtaining information to give legal advice, that

13   that is privileged.  I don't disagree that --

14               THE COURT:  Here's the problem I'm having is that the

15   communication between the lawyer and Scripps, obviously that's

16   attorney/client privilege, but what the third party said,

17   you're saying that what the third party said is covered by the

18   attorney/client privilege?

19               MS. HARDY:  Well, if there was a witness statement,

20   then I don't think that would be, but there isn't a witness

21   statement.  All there are are attorney notes.

22               THE COURT:  But it's a witness statement.  It's a

23   statement by a witness in a form that you're saying is covered

24   by the attorney/client privilege, but it's a witness statement.

25   That's what I'm trying to -- I'm trying to get to whether the

1    attorney in this investigation took statements and then put it

2    into her letter in a way that makes it such that the plaintiff

3    can't see the statements that were made by the third parties.

4         MS. HARDY:  I don't believe it would be a fair

5    characterization to say she took a statement.  I think she took

6    notes in which she incorporated, umm, to some extent what she

7    may have learned from the witness and her impressions about how

8    she viewed that from the lawyer perspective.

9         THE COURT:  Did she identify who she spoke to?

10        MS. HARDY:  Yes, three people.

11        THE COURT:  But you're saying that even in an

12   interrogatory, you wouldn't say who, what those witnesses said

13   to her?

14        MS. HARDY:  Well, first thing, they weren't

15   complaints, they were just people who came forward to share

16   information as part of an investigation.

17        THE COURT:  I understand that, but they're statements

18   made by witnesses.

19        MS. HARDY:  Well, I don't, without -- I don't know

20   how to extract from her notes without compromising the

21   privilege what the witnesses had to say.  Now of course they

22   could be deposed by Mr. Hanna if he's interested and to ask

23   them what they had to say.  That wouldn't be privileged, but to

24   go directly to the lawyer's notes I think would tread upon

25   privilege in a way that would not be proper legally and in

```
1    addition to the privilege issue, we also have a relevance issue
2    which is that, you know, the whole issue here is was remedial
3    action taken with respect to plaintiff.  She has unequivocally
4    testified she had no further problems with Mr. Maddox.  The
5    problems she had after the remedial action was taken was with
6    her co-workers who she thought were gossiping.
7            THE COURT:  So to the extent that any of those
8    witnesses had information about that, why wouldn't that be
9    relevant?
10           MS. HARDY:  But she's got that.  She's got everything
11   that -- she has every -- she has the whole file from '15 from
12   people that they talked to.
13           THE COURT:  No, I'm talking about if someone said in
14   2017 provided information that buttresses her statements about
15   what happened to her, so what's the case that you're referring
16   to, the Supreme Court case?
17           MS. HARDY:  Upjohn.
18           THE COURT:  Am I seeing it in the response?  I don't
19   see it in the response.
20           MS. HARDY:  Umm, I don't know if it's in the
21   response, but because I don't think we had to reach that issue,
22   but we didn't go into --
23           THE COURT:  I mean, I think that Mr. Hanna definitely
24   went into what happens if an attorney is the one conducting the
25   investigations.
```

1          MS. HARDY:  We'll get your Honor a cite, but if I

2    could go back to the relevance issue?  She made a complaint in

3    '15.  Remedial action was taken in '15.  The problem with

4    Mr. Maddox was over with, so what some other person claims may

5    have happened to them at some other point in time --

6          THE COURT:  That's not what I said.

7          MS. HARDY: -- is not relevant to the plaintiff.

8          THE COURT:  That's not what I said.  What I said was

9    that if in the investigation someone might have shared

10   information that would be relevant to what occurred before Ms.

11   Edwards resigned.

12         MS. HARDY:  They did not share information that

13   related to Tara Edwards and Malcolm Maddox.  That, I can

14   affirmatively answer.  That was not -- it was about issues they

15   had with Mr. Maddox which would have no bearing on her

16   complaint about her issues with Mr. Maddox.

17         THE COURT:  Okay.  I have the Upjohn case.  Give me a

18   minute, please.

19              (Pause)

20         THE COURT:  Okay, so I think that the Upjohn case is

21   talking about what happens when the client is giving

22   information to the attorney, that the client that the

23   information gives to the attorney is covered by the privilege.

24   Is that accurate?

25         MS. HARDY:  Yes.

```
 1              THE COURT:  All right.  Mr. Hanna, I already told you

 2     that I found your, umm, your footnotes to be overwhelming.  Is

 3     there a particular opinion that you want to direct me to that

 4     talks about the specific issue of whether statements made

 5     during an investigation that are reflected in an attorney's

 6     notes are discoverable?

 7              MR. HANNA:  Sure.  I mean, before we get into the

 8     waiver argument, Judge, can --

 9              THE COURT:  Can you actually just address the

10     question before you go to what you want to tell me?

11              MR. HANNA:  Sure.

12              (Pause)

13              MR. HANNA:  For example, in Upjohn, Upjohn stands for

14     the proposition that plaintiff is entitled to the underlying

15     facts of the investigation if you go to page 395 and 396.  We

16     actually cited Upjohn.  Aside from Upjohn, I can give you other

17     cases if you'd like.

18              THE COURT:  Well, you're saying in Upjohn they said

19     that the attorney/client privilege applied to statements made

20     by corporate superiors it looks like, but I, obviously I

21     haven't had a chance to really digest this opinion.  I'm just

22     looking at it on the Bench now.

23              MR. HANNA:  Yeah and if you go to page, umm, this is

24     not a corporate superior, Judge.  This is, they are employees

25     that defendants --
```

1              THE COURT:  What page are you talking about?

2              MR. HANNA:  Yeah, defendants do not represent these

3     individuals, Judge.

4              THE COURT:  What page did you say?

5              MR. HANNA:  Yeah, 395 to 396, Judge.

6              (Pause)

7              THE COURT:  See, what I'm reading here is it says

8     that the government could subpoena the witnesses, but that, so

9     tell me what language you're saying?

10             MR. HANNA:  I don't have the, I don't have the case

11    in front of me, Judge, but I could give you other --

12             THE COURT:  It says our decision, our decision of the

13    communications by Upjohn employees to counsel are covered by

14    the attorney/client privilege disposes of the case so far as

15    the response of the questionnaire.

16             MR. HANNA:  There's numerous cases that I've cited

17    Judge that clarify that.

18             THE COURT:  And I'm asking you that, yes, you did

19    cite numerous and not all of them are precisely on point and

20    some of them are in crowded footnotes and that's why I was

21    asking you for a specific opinion that would address this

22    particular issue.

23             MR. HANNA:  So, okay.  You're scaring me here because

24    I feel like if I don't give you one -- okay.  In Reinhard,

25    Dow Chemical Company v. Reinhard which is an Eastern District

1    of Michigan case.

2              THE COURT:  What's the citation?

3              MR. HANNA:  2008 West Law, 2245007.

4              THE COURT:  2004 West Law, 224?

5              MR. HANNA:  5007.  It says the protection extends

6    only to communication with the attorneys, but not the facts;

7    that is, the communication of facts to an attorney does not

8    shield those facts from disclosure.

9              THE COURT:  But see, that's what they're saying.

10   What they're saying is that you can, you can depose those

11   witnesses and require them to testify about what they said, but

12   you don't get to see their documents and that's actually what

13   Upjohn says.  That didn't show anything.  I don't know what

14   happened to that.

15             MR. HANNA:  So I mean, we're not required to take

16   what they're saying at face value, Judge, as far as what those

17   communications had and whether they were or were not.  You

18   know, first, defendant said --

19             THE COURT:  No.  They're saying you don't have to do

20   that, that you can actually subpoena the witnesses or notice

21   the witnesses to testify and ask them about what they reported.

22             MR. HANNA:  But these documents are highly relevant,

23   they're discoverable.  The privilege does not apply, they're

24   not their clients and, you know, we would object to that,

25   Judge.  Let me pull up another case that hopefully can make it

1    clearer.  This investigation that they've conducted is the type

2    of routine investigation that's done every day by HR personnel.

3    You cannot circumvent the discovery of this information by

4    having an attorney --

5            THE COURT:  I understand your argument, but the

6    Upjohn case does say what they said which is that the, you

7    know, that the, umm, even though I'm saying this with reading

8    limited portions of the opinion, but it does appear to say that

9    communications to the attorney of the corporate employees was

10   privileged, but that the witnesses could be subpoenaed to

11   testify, but that the in --

12           MR. HANNA:  I mean, there's the whole line of cases

13   regarding the sword and shield where they're not permitted to

14   use this investigation and the fact that they purportedly took

15   effective remedial measures as a sword while simultaneously

16   sheathing us from that discovery.  I mean, with what you're

17   saying, Judge, then the motion to compel those text messages

18   shouldn't be produced.  They could just ask those witnesses

19   what they discussed with them.  You know, that could go --

20           THE COURT:  That's not the same as the

21   attorney/client privilege.

22           MR. HANNA:  Would value --

23           THE COURT:  So in terms of shielding the information,

24   it's not that they're shield -- the information is shielded

25   because the witnesses can be called to testify about whatever

1    they told the attorney.

2         MR. HANNA:  And they could also be called to testify

3    about whatever they texted each other on.

4         THE COURT:  But the text messages don't enjoy the

5    attorney/client privilege so that's a different animal.

6         MR. HANNA:  And we would argue that there is no

7    attorney/client privilege that protects these documents.

8         THE COURT:  Okay, I just -- I understand that you

9    feel on the spot, but at the same time this is your argument

10   and there are, you know, some of the pages are half footnotes.

11   Page 10 for example is just half footnotes --

12        MR. HANNA:  I mean --

13        THE COURT:  -- and so I'm just trying to get you to

14   tell me, umm, I understand I see the narrow confidential

15   communications and I understand the idea that the business

16   advice is not covered, but they're saying that they gave legal

17   advice and that the legal advice could be used to make business

18   decisions.  I understand that if the attorney is not acting in

19   the role of an attorney, that that's not covered by

20   attorney/client privilege.  I'm asking you very specifically

21   whether there's any opinion that you can cite to that says that

22   your remedy isn't to depose the particular witnesses, it's to

23   get the documents authored by the lawyer.

24        MR. HANNA:  That issue was not specifically provided

25   in their papers so I don't have a specific cite on that

```
 1    argument.  That argument was not made.  I have --
 2              THE COURT:  Okay.
 3              MR. HANNA:  -- you know, and I understand now from
 4    working in front of you in the future I'm not going to cite all
 5    of these cases.  Some judges might want that and clearly you
 6    don't prefer that, so point taken, but --
 7              THE COURT:  No, it's not that I don't want all the
 8    case, but some of the cases aren't that -- their claim isn't
 9    that they gave business advice, their claim is that it's an
10    attorney/client privilege and as you noted --
11              MR. HANNA:  Well, that --
12              THE COURT:  -- it really is a, umm --
13              MR. HANNA:  That's just it --
14              THE COURT:  -- a Court wants to proceed with caution
15    before ordering the disclosure of documents that include legal
16    advice from an attorney and so that's why I'm trying to get to
17    any opinion that gets to that specific issue.
18              MR. HANNA:  And point well taken, Judge, and we
19    respect the attorney/client privilege and because of that we
20    didn't even, we said alternatively if the Court would prefer,
21    the documents could be produced in camera and the judge can
22    decide --
23              THE COURT:  But --
24              MR. HANNA:  -- because at the end of the day, we
25    don't have to listen to what they -- they want to classify it
```

1    as attorney/client privilege.  These sure look like

2    investigations to me, but you can call it -- they can't just

3    call it an attorney/client privileged communication and it's

4    not an investigation and not produce these documents.  Malcolm

5    Maddox was terminated weeks after these investigations.  They

6    didn't call counsel an attorney by the way.  They said in their

7    e-mail Scripps then brought an outside independent investigator

8    who also found no evidence of further misconduct by Maddox

9    after his 2015 discipline.  His 2015 discipline was the

10   discipline of Tara Edwards, so these investi -- so that, so

11   basically this case and mind you in ELCRA, you can only go back

12   to three years, right, so you only go back at the time when

13   this investigation was done and then what happened afterwards.

14   So this investigation happened and what happened afterwards is

15   what's relevant to this case and these investigations are what

16   investigated, what happened after her complaint to see whether

17   they took effective remedial measures.  It's, these are

18   investigations and --

19            THE COURT:  Okay.  Let me put it this way.  So I'm

20   going to deny this request without prejudice and, umm, if --

21   and I am going to suggest that you, umm, is there something

22   that you wanted to show me?

23            MR. HANNA:  Yeah, I mean, we've had the same issue

24   before against University of Michigan in a case here and

25   because we cannot determine whether it is truly attorney/client

1    privileged or not, there, magistrate Whalen ordered that the

2    documents be produced in camera.  We would object --

3            THE COURT:  I've done it before and I haven't seen

4    Magistrate Judge Whalen's opinion that you're referring to, but

5    there does need to be some sort of preliminary showing.

6            MR. HANNA:  I think there is preliminary showing,

7    Judge.  The e-mail they sent out concerning these

8    investigations and the fact that the harasser, they

9    investigated him regarding sexual harassment and then they

10   fired him like a week or two later and they're saying oh, no,

11   no, no, it wasn't because of that, it was because of this that

12   we fired him.  Well, okay, but this is still discoverable.

13   These investigations are the most important documents.

14           THE COURT:  All right, so as I was saying, you can --

15   I'm going to deny it without prejudice.  You have the ability

16   to call the witnesses and since the witnesses have been

17   disclosed.

18           MR. HANNA:  They have not been disclosed, Judge.

19           THE COURT:  Okay.  Ms. Hardy said they were

20   disclosed.  Can you tell us who the witnesses are or where

21   they've been disclosed?

22           MS. HARDY:  I don't believe they have been disclosed

23   to date, but we will, if they ask for them, we'll disclose them

24   and we can disclose them right now if the Court would prefer.

25           THE COURT:  If you could disclose them right now.

1          MS. HARDY:  Umm, two points I'd like to make and

2     while Mr. Davis is pulling up the names, I just went back to

3     read the 2017 file from Danyelle Wright who's the attorney and

4     she's the one who asked people to come forward if they had

5     anything to say about Mr. Maddox.  She had Michelle Zackay who

6     is the HR director at the station assist her in some of the

7     interviews and Michelle Zackay created some interview notes

8     along with Danyelle Wright's interview notes.  We assert that

9     certainly the lawyers' notes are privileged as well as anyone

10    who's functioning in conjunction with her as part of the

11    investigation, but I just wanted --

12         THE COURT:  You're saying the human resources

13    investigation, that her notes --

14         MS. HARDY:  No, no, no, no.  Not the human -- not the

15    one that related to plaintiff.  Danyelle Wright in response to

16    the Rideout conference decides that she is going to, she wants

17    to --

18         THE COURT:  I understand, but you're saying that the

19    human resources employee took notes of the interviews with the

20    employees and that the human resources' employee's notes are

21    also privileged?

22         MS. HARDY:  Yes.  If she's acting at the direction of

23    counsel and is is part of the legal investigation, if she's

24    assisting with it and her, she has been asked to participate at

25    the direction of counsel and is being given direction of

1    counsel and is reporting to counsel what she has learned, her

2    notes would also be privileged under Upjohn and its progeny.

3             THE COURT:  I'm having a much harder time with that

4    one.

5             MS. HARDY:  We'd be happy to brief that, your Honor.

6             MR. HANNA:  Judge, if that's the case, all of these

7    investigations of big companies are in some way, shape or form

8    within the directions of their in-house counsels.

9             MS. HARDY:  Well, that's not true and this wasn't

10   just in some way, shape or form, this was Danyelle Wright who

11   came from Cincinnati to the station.  She is an employment

12   lawyer with Scripps Howard and she conducted the, I don't even

13   know if you'd really call it an investigation, but she is the

14   one who asked people to come forward to hear if there was

15   anything further about Mr. Maddox since the Tara Edwards

16   complaint.

17            THE COURT:  But the human resources employee who's

18   taking notes is not including any attorney impressions.

19            MS. HARDY:  Well, she is acting at the direction of

20   counsel as part of counsel's investigation.

21            THE COURT:  That doesn't necessarily cloak her in

22   attorney/client privilege.

23            MS. HARDY:  I believe it does under Upjohn.

24            THE COURT:  Let me see.  Let me read something.

25            (Pause)

```
 1              MS. HARDY:  Your Honor, Mr. Davis was just clarifying

 2     that the principle is articulated in cases following Upjohn

 3     relying upon the Upjohn precedent, but not expressly

 4     necessarily addressed in Upjohn itself.

 5              THE COURT:  I'm sorry, I'm trying to read.

 6              (Pause)

 7              THE COURT:  All right, I am going to need further

 8     briefing on this and I would like the briefs to be no more than

 9     five pages each and please just direct me to the most salient

10     legal authority.

11              MS. HARDY:  Your Honor, there's one other

12     investigation which is at issue in plaintiff's request and

13     that's the 2018 investigation.  Now that's totally different,

14     again, from '15 and from '17 and that was there was a draft

15     complaint that had been forwarded to my client and my law firm

16     was retained to provide legal advice to my client about legal

17     risks and Ms. Sonja Lengnick conducted an investigation for --

18              THE COURT:  Who is that?

19              MS. HARDY:  Sonja Lengnick of our firm.

20              THE COURT:  An attorney from your firm?

21              MS. HARDY:  Yes.  She conducted an investigation to

22     determine what advice to provide to our client with this

23     pending lawsuit and that's another investigation that they're

24     seeking.  That was strictly to provide legal advice to our

25     client as to what --
```

1      THE COURT:  And so there were no more interviews with

2  any employees of --

3      MS. HARDY:  No, there were interviews.  There

4  definitely were interviews.  Ms. Lengnick went back and asked

5  questions to determine whether, not to go back to Tara Edwards,

6  but to determine whether any further problem had occurred with

7  respect to Mr. Maddox that we should be aware of and that the

8  client should take into consideration when it was determining

9  how to assess the lawsuit and how to assess its workplace.

10     THE COURT:  So how is that different?  How is that a

11 different investigation?

12     MS. HARDY:  Because there's a pending legal matter or

13 about to be a pending legal matter and outside lawyers are

14 hired to, to gather information and make legal assessments and

15 advise our client.  I think that's like the most classic

16 example of a privileged investigation because it is --

17     THE COURT:  I guess let me ask you this.  Were you

18 talking -- was she talking with like the HR personnel or people

19 or was she again interviewing employees who had their own

20 experiences?

21     MS. HARDY:  Both.

22     THE COURT:  Okay.  I think that then that that just

23 needs to be covered by the same --

24     MS. HARDY:  Brief?

25     THE COURT:  -- brief because and I understand what

1    you're saying is that work product in pending -- so I

2    understand the distinction, but to the extent that she is

3    interviewing witnesses, the question is whether, not whether

4    her impressions are relevant or are discoverable because of

5    course her impressions and her advice is not discoverable, but

6    to the extent that there were statements made, I do think

7    number one, anyone who has, umm, Mr. Hanna has not asked for

8    the identity of witnesses who are interviewed?

9         MR. HANNA:  Of course we have.

10        MS. HARDY:  I don't believe he has.

11        MR. HANNA:  Judge, that's covered in numerous

12   requests and interrogatories and I, we would have this part

13   briefed because then this is part of the, the big issue that

14   we're having here is that counsel for defendant is a witness, a

15   material witness in this case.  This information is not

16   protected and there's numerous case law that talks about

17   communication if it's mixed with legal advice and business

18   management decision is not covered.

19        THE COURT:  I understand that --

20        MR. HANNA:  They --

21        THE COURT:  -- but I think what they're, what they

22   said and I think that it -- if you're saying that any time a

23   corporation hires a lawyer to provide legal advice that leads

24   to someone being fired, had this that attorney becomes a

25   witness, I just think that that just is not, that just doesn't

1    measure with my understanding of the law at all.

2           MR. HANNA:  We'd be happy to brief that, Judge, and

3    for example we have another case against their law firm where

4    an investigation happened regarding discrimination.  They hired

5    one law firm that investigated and then that company, that

6    defendant hired counsel for defendants' law firm to represent

7    them in that matter and that's classically how it's done where

8    you hire --

9           THE COURT:  And you're saying that the lawyer that

10   gave the legal advice that led to the termination is now the

11   witness?

12          MR. HANNA:  It depends what -- see, it's tricky,

13   that's why the Court would likely have to review because if

14   this is legal advice, if the advice is fire Maddox, that's

15   business decision.  You cannot circumvent an investigation that

16   led to the termination of a harasser --

17          THE COURT:  Okay.  All right, I'm not going get into

18   that right now.  I do think that that's not compatible with my

19   understanding of the whole idea of seeking legal advice.  Even

20   if that legal advice as defense said leads to a business

21   decision, that doesn't mean that the legal advice now is not

22   covered by attorney/client privilege.

23          MR. HANNA:  Judge, if I could point you to some cases

24   in the brief regarding that issue?

25          THE COURT:  Okay.

1          MR. HANNA:  Give me one second, please?

2          (Pause)

3          MR. HANNA:  For example, Mesa -- Musa-Muaremi and the

4     quote is "The privilege does not, however, protect business

5     decision advice even when that business advice is rendered by

6     an attorney or an attorney is the one, is one of the

7     participants in the business decision."  There's also --

8     there's several other cases in that regard and there's also

9     cases that talk about this very instance where some kind of

10    legal action was initiated and then the attorney conducted an

11    investigation that led to a business decision and even there --

12         THE COURT:  Give me a citation.  That's what I asked

13    you.

14         MR. HANNA:  Certainly.  For that one, it would be

15    Harding, 914 F Supp. At 1090.  There, they permit the

16    deposition of outside counsel in a sexual harassment

17    investigation conducted by the same after complaint was filed

18    with New Jersey division of civil rights where the employer

19    alleged the purpose of the investigation was to determine the

20    factual basis of plaintiff's complaint.

21         (Pause)

22         THE COURT:  Okay.  That's actually not what this case

23    is saying as I read it.  It says that the -- it said that the

24    attorney's investigation clearly falls within the purview of

25    attorney activity and finds that the investigator was acting as

```
 1     an attorney for the purposes the attorney/client privilege.

 2             MR. HANNA:  For Harding?

 3             THE COURT:  Oh, it says that there's an order for a

 4     deposition -- yeah, this is going to have to be included in the

 5     supplemental briefing.

 6             MR. HANNA:  Would the Court mind if I point your

 7     attention to one more case that might --

 8             THE COURT:  No because, you know, me trying do this

 9     on the Bench and make a -- I think that this is definitely a

10     very complicated issue that even though it was addressed and

11     there are a lot of opinions cited, it really, the briefs I

12     don't think did enough to really hone in on what we're talking

13     about here, number one, that whether you're saying that the

14     attorney's impressions from the first, the 2017 investigation

15     are relevant and then there's the issue of the human resources

16     and whether the human resources investigation is covered by

17     attorney/client privilege and now we have you saying that the

18     attorney who was -- that these attorneys are witnesses and that

19     they were not providing legal advice, they were only simply

20     providing business advice and it's not covered by the

21     privilege.  The opinion that you just drew me to, it does look

22     like the attorney was --

23             MR. HANNA:  Deposed.

24             THE COURT:  -- had to be deposed, but that the Court

25     clearly said that his, his work, he was acting as an attorney
```

```
 1    when he was conducting the investigation so --
 2             MR. HANNA:  We recognize that it's a complicated
 3    which is part of the reason we had so many cases and part of
 4    the reason, I'm just saying I think the Court should just
 5    review the documents.  I understand that I don't know if the
 6    Court will ever feel comfortable enough to just say go ahead,
 7    take it, I get that and that's why we said --
 8             THE COURT:  Whether or not I review the documents
 9    really has no -- it's not relevant whether I review the
10    documents if they are protected by attorney/client privilege,
11    then they can't be disclosed, so --
12             MR. HANNA:  But they're saying they're protected by
13    the attorney/client privilege.  They're, you know --
14             MS. HARDY:  Your Honor --
15             MR. HANNA:  -- they're not.  That's the whole thing,
16    they can call that.
17             THE COURT:  Okay, I'm not going to -- go ahead,
18    Ms. -- I'm going to --
19             MS. HARDY:  There's no basis for him asserting that
20    we were providing business advice.  We're lawyers, we're
21    employment lawyers.  We were hired to provide legal advice on
22    employment questions.
23             THE COURT:  I, I I, certainly understand your and the
24    opinion, I didn't read this opinion --
25             MR. HANNA:  Judge, if I may address that point?
```

1           MS. HARDY:  And then that the other issue that Mr. --

2           THE COURT:  No because I'm going to have further

3    briefing and I don't want to hear anymore argument on it.

4           MS. HARDY:  The other issue that he's confusing and

5    we'll address this in the brief, but there is a concept of, you

6    know, and in sexual harassment cases, employers under, and

7    particularly under Title Seven --

8           THE COURT:  Is that something that won't be included

9    in the supplemental brief that you have because it's almost,

10   it's after four now and so --

11          MS. HARDY:  I can say this very quickly.  We are not

12   using this 2017 or '18 investigation as an affirmative defense

13   or as a way to explain in the context of this legal action that

14   we conducted an investigation --

15          THE COURT:  I really -- okay, like I said --

16          MS. HARDY:  -- and that's the shield and sword

17   argument that he's referring to and we're not --

18          THE COURT:  All right.  I'd like for that to be

19   addressed --

20          MS. HARDY:  -- using it as a shield.

21          THE COURT:  -- in supplemental briefing and for us to

22   go, to address Mr. Hanna, I am not seeing the relevance of any

23   comparators, any other investigations covered by Mr. Murri.  I

24   don't see how -- I'm not seeing the relevance of that at all.

25          MR. HANNA:  I mean, that's a lot more relevant than

1    what they were requesting.  The fact that Mr. Maddox was, may

2    have investigations concerning sexual harassment is not

3    relevant to my client's sexual harassment claim?

4           THE COURT:  That's -- you -- what I said was

5    Mr. Murri.

6           MR. HANNA:  The fact that --

7           THE COURT:  You want every, you want files on every

8    quote unquote "comparator".  You want a delineation of every

9    sexual harassment investigation that Mr. Murri has been

10   involved in --

11          MR. HANNA:  Others.

12          THE COURT:  -- in the full Scripps, you know, in the

13   full corporation and again, since there's no allegation of

14   similarly-situated employees been treated differently, I don't

15   see the relevance of all of that and certainly not that it's

16   proportional.  I don't see how that's going to make --

17          MR. HANNA:  There is --

18          THE COURT:  -- any more likely that Mr. Maddox

19   sexually harassed Ms. Edwards and that the treatment that he

20   received was not adequate to remove the hostile environment

21   that she was suffering such that she was constructively

22   discharged.

23          MR. HANNA:  I -- we object, your Honor.  I -- we'll

24   object to it.

25          THE COURT:  Okay.  You have, I mean, I've told you,

 1    but you haven't explained how that's relevant so I'm giving you

 2    the opportunity.

 3              MR. HANNA:  Sure.  All the cases say this stuff comes

 4    in.  They haven't provided one authority that says this type of

 5    stuff doesn't come in.  It's highly relevant.  It's

 6    discoverable.  It's discoverable for several reasons.  The

 7    fact --

 8              THE COURT:  Okay.  So I looked up your authority and

 9    I will give you an example of something that you've cited.  It

10    says discrimination cases, this is the Bobo case, frequently

11    turn on whether the plaintiff can identify one or more

12    comparaties who are similarly situated in all relevant

13    respects, the type of cases that allow comparator information

14    address where there are allegations that similarly-situated

15    people are treated differently.  I asked you at the beginning

16    of this hearing whether that was your claim and you said no.

17              MR. HANNA:  You're talking about comparators to the

18    client, not to the harasser, so similarly-situated harassers

19    who are not star anchors who did a lot less sexual harassment,

20    but weren't fired is highly relevant and that comes --

21              THE COURT:  Star harrassers aren't a, you know,

22    they're not a suspect classification so -- all right, I'm

23    not --

24              MR. HANNA:  You can conduct comparator evidence.

25    Comparator doesn't have to be about the plaintiff.  It could be

1    about -- the defendant.  It could be about the harasser.

2         THE COURT:  I haven't seen that and that's not what

3    the opinions that you cited were addressing.  They weren't

4    saying compared to other employers or other harrassers, it was

5    the similarly-situated comparator analysis has to do with a

6    claim that someone was discriminated in that they were treated

7    differently than someone who is outside of their classification

8    and that's not this case.

9         MR. HANNA:  Similarly-situated plaintiffs who weren't

10   discriminated against by star employees were treated

11   differently.

12        THE COURT:  That's not the suspect classification

13   though.

14        MR. HANNA:  I understand, Judge.

15        MS. HARDY:  Your Honor, there's a fundamental

16   difference between disparate treatment and hostile work

17   environment.  The comparator analysis has nothing to do with

18   hostile work environment.

19        THE COURT:  That's what I, I said, so, umm --

20        MR. HANNA:  Comparator evidence has been introduced

21   in numerous hostile work environment cases across the country.

22        THE COURT:  Okay.  So are you able to point to

23   because I, I quoted the Bobo case.  The Bobo case is talking

24   about similarly-situated employees.  Can you point to a sexual

25   harassment case where the allegation is not made that someone

1    was treated differently than similarly-situated employees

2    outside of their suspect classification in which comparator

3    evidence was, was allowed?

4              MR. HANNA:  Sure, one moment, Judge.

5              (Pause)

6              MR. HANNA:  If you look at Braud v. Geo Heat

7    Exchangers, there it states defendant's actions taken in

8    response to plaintiff's allegations and those of other

9    employees is relevant to the claims before the Court.

10             THE COURT:  I'm sorry, say that again?

11             MR. HANNA:  Defendant's actions taken in response to

12   plaintiff's allegations and those of other employees is

13   relevant to claims before the Court.

14             THE COURT:  That's saying comparator?

15             MR. HANNA:  But it talks about defendant's action

16   taken in response to other employees is relevant to the claims

17   before the Court and that's exactly what we're saying.  The

18   actions they took in response to other employees is relevant to

19   the claims of the Court, before the Court.

20             THE COURT:  Okay, this one doesn't -- just, okay.

21   Can you give me the citation for that?

22             MR. HANNA:  314 F.R.D., 386 and what I just cited for

23   you, Judge, is on page 390.

24             MS. HARDY:  Mr. Hanna's talking about adverse job or

25   I'm sorry, not adverse job action, he's talking about remedial

1   action, did Scripps take appropriate remedial action as that's

2   defined in light of a sexual harassment complaint.  That is not

3   measured by what they do with respect to others.  It's all

4   measured by whether or not their actions are reasonably

5   designed to end the harassment, to remedy the problem.

6            THE COURT:  Okay.  I'm trying to --

7            MR. HANNA:  Not true --

8            THE COURT:  What I -- so where, what page are you

9   saying?

10           MR. HANNA:  390, Judge.

11           THE COURT:  390.

12           (Pause)

13           THE COURT:  This says that the harasser's personnel

14  file is relevant.

15           MR. HANNA:  Right, well, that is part of our request

16  is the har --

17           THE COURT:  That's not what I was referring to.  I

18  was referring to you getting personnel files and other

19  discovery regarding quote unquote "comparators" --

20           MR. HANNA:  Right, I think --

21           THE COURT:  -- and this doesn't relate to

22  comparators --

23           MR. HANNA:  Are you talking about where the --

24           THE COURT:  -- and to any and all sexual harassment

25  investigations involving Mr. Murri and you said that that

1    includes any investigation that Mr. Murri has been involved in.

2         MR. HANNA:  I mean, for one thing, Judge, we don't

3    even know how many he's done.  It could be just one other one,

4    you know, and if you notice from the investigative file that we

5    did get --

6         THE COURT:  Okay, but you still have to show the

7    relevance it and I'm not understanding the relevance of, umm,

8    if you seek all documents related to all sexual harassment

9    investigations that involve plaintiff, Mr. Maddox and Mr. Murri

10   and you said that that includes, umm, all and I asked about

11   Mr. Maddox.  We -- I think, umm, sort of exhausted that and

12   that the question is whether the document from the other

13   investigation, the 2017, 2018, you know, those two subsequent

14   investigations are covered by attorney/client privilege, but in

15   terms of all documents regarding all sexual harassment

16   investigations that Mr. Murri has participated in, it's just

17   not relevant and, umm, so.

18        MR. HANNA:  I think a part of that case is on 390

19   where it says defendant's actions taken in response to

20   allegations and those --

21        THE COURT:  The harasser's employment personnel file

22   is relevant according to that case.

23        MR. HANNA:  I understand that that was and that

24   was -- it's the reasoning behind that, but that's fine.

25        THE COURT:  Okay.  And then this, umm --

1           MR. HANNA:  So just so we're clear, Judge, it appears

2     you are denying the portion connect for Mr. Murri, but you want

3     further briefings for the investigations related to Mr. Maddox;

4     is that correct?

5           THE COURT:  Yes, that's true and then the comparator

6     evidence that you're talking about.

7           MR. HANNA:  Oh, you do want it for that, too?  Okay.

8           THE COURT:  No, I'm denying it for RFP 18 and 23

9     because I don't see how comparator evidence is relevant in this

10    case given the legal theories at issue here.  I think we've

11    addressed the privilege log to some degree.  I will say I'm not

12    understanding the allegation that the privilege log isn't

13    specific enough because --

14          MR. HANNA:  Well, as far as it being not specific

15    enough, let me pull it up.  For example, 12-6-17 it just says

16    Dave Giles (phonetic) which is one of their attorneys and it

17    says investigation materials.  I don't know who he talked to.

18    As far as the witnesses, they've never even been disclosed.

19    Nothing has been disclosed about the 2017 and 2018

20    investigation.  We received one e-mail where they refer to

21    defense counsel as the outside investigators.  They don't even

22    call them attorneys, they call them outside investigators were

23    hired to investigate all wrong-doing after the January, 2015

24    and then we saw that one e-mail and we said wait a minute,

25    there's two other investigations, none of this is disclosed

1    anywhere.  It's not even in the privilege log.  Arguably

2    they've waived all of their privilege regarding those

3    investigations, so as far as the insufficient part of my

4    privilege log motion to compel, it's because there's --

5            THE COURT:  Ms. Hardy, why aren't there privilege

6    logs concerning those investigations?

7            MS. HARDY:  Because they're not otherwise

8    discoverable, we're not required to disclose them on the

9    privilege log and we have repeatedly for very solid reasons

10   said that they're not relevant because plaintiff is gone from

11   the workplace.  What may have happened with Mr. Maddox and some

12   other employee after she's gone has nothing to do with her

13   claim.

14           THE COURT:  Okay.  Well, I'm going -- I don't know

15   that and I, umm, and as I said earlier, to the extent that,

16   umm, that the people who were interviewed during those

17   substantive investigations, they could shed light on things

18   that happened before Ms. Edwards resigned so you are going to

19   need to supplement your privilege log.  Mr. Hanna asked for

20   that and I understand that you're saying that it's not

21   relevant, but that is again a unilateral determination that

22   it's not relevant and I think Mr. Hanna does get, he does have

23   the right to determine whether especially since Mr. Rideout or

24   Reverend Rideout I think was referring to Ms. Edwards'

25   allegations, to what at least what, who was interviewed during

1    that time period and who participated in the investigation and

2    even if ultimately the materials are protected by

3    attorney/client privilege, that doesn't mean that all the

4    witnesses aren't subject to depositions or some sort of

5    discovery.

6         MS. HARDY:  And we've never contended that they're

7    not.  In fact I expressed this, said earlier he's free to

8    depose people to ask what they may --

9         THE COURT:  Well, what I'm saying is that you need to

10   augment the privilege log.  You need to supplement the

11   privilege log to include the subsequent investigations.

12        MS. HARDY:  Well, and we can identify them, but

13   you're not suggesting I would believe that we identify anything

14   that leads to content of investigations.

15        THE COURT:  No, I said the privilege log needs to

16   include the documents that you're saying are privileged from

17   those subsequent investigations.

18        MS. HARDY:  Well, you mean identify that there was an

19   investigation conducted by Danyelle Wright in 2017 as a

20   result --

21        THE COURT:  Just like your privilege log says here he

22   a document that is covered by attorney/client privilege because

23   it's -- I don't have it before me, but I felt, I did think that

24   this, the identifying information on the privilege log was

25   sufficient, but you do need to include the documents that

1    pertain to the subsequent investigations that you're arguing

2    are covered by attorney/client and work product privilege.

3            MS. HARDY:  I'm not clear how to do that without

4    revealing -- I mean, let me take an example, Sonja Lengnick's

5    investigation.  She had an investigation report, she had an

6    investigation notes.  I mean, clearly those haven't been

7    produced or Bates labeled because we contend they're privileged

8    and they're not part of the case.  I mean, I can describe them.

9            THE COURT:  So you're saying you can include her name

10   and investigation and, you know, you provide the descriptions

11   to explain why you're withholding them.

12           MS. HARDY:  Okay.

13           THE COURT:  They should be part of the privilege log.

14           MS. HARDY:  All right, we will do that.  Umm, I'm

15   sure there will be a disagreement.  I mean, there's a line

16   between describing them so that they understand that it was an

17   investigation conducted by lawyers, you know, to provide advice

18   to the client and saying she produced an investigatory report

19   to the client describing what our conclusions were, but

20   obviously --

21           THE COURT:  That's not what you have on the privilege

22   log now.

23           MS. HARDY:  Well, I know.  We did --

24           THE COURT:  The log is just a description of what it

25   is that you're withholding.

1          MS. HARDY:  Well, yeah.  As Mr. Davis is indicating,

2     the line I'm struggling with, we don't want to walk into a

3     waiver problem and yes, we can add even though I don't think we

4     were obligated to do this before, but we'll do it at the

5     Court's --

6          THE COURT:  I don't agree.  You're withholding

7     documents that he's requesting and you're saying that they're

8     privileged and it's not your unilateral decision that they're

9     not relevant because they did have some connection.  The

10    termination did have some connection to Ms. Edwards because

11    that, that later investigation was connected to Reverend

12    Rideout's allegation so I think that Mr. Hanna doesn't have to

13    take your word for it that it has no relevance whatsoever to

14    Ms. Edwards.  I'm trying to find the privilege log.  Here it is

15    right here.

16         MS. HARDY:  I believe the obligation of the moving

17    party is to, umm, if we assert relevance, we have a right to

18    rely upon that until there's been a motion filed with the Court

19    and a ruling of the Court that we're incorrect on relevance and

20    that that objection --

21         THE COURT:  Okay, I'm ruling that you're incorrect on

22    relevance and you have here author, I've found it, the date,

23    the author, the recipients, the subject and it just says things

24    like e-mail with attachments and correspondence.  You have the

25    RFP number and the, you know, the type of privilege.  To the

1    extent that you have said that these documents are privileged,

2    then they should be included on the privilege log.

3          MS. HARDY:  We will do that.  I'm just, I'm concerned

4    about the fact that if the Court's going to rule on relevancy,

5    I haven't had a chance to really address that issue, it's been

6    predominantly Mr. Hanna and there are just sound legal reasons

7    why what happens after the plaintiff leaves --

8          THE COURT:  I thought that you did argue it and I

9    addressed it.  You said that it has nothing to do with it

10   because she was already discharged and what I've said more than

11   once is that, you know, he doesn't know and I don't know to

12   what extent after Reverend Rideout made his allegations any of

13   the investigation had to, you know, reflected on what happened

14   with Ms. Edwards, so to me it's, it's patently relevant or it

15   has the potential, it's obviously has a potential that

16   witnesses could have said things that are relevant so that

17   would allow Mr. Hanna to then find out what documents they are

18   and the very least find out who provided information to the

19   investigators.  So I think that you have made your argument.

20   I've heard it.  I've regurgitated it to you and I've told you

21   why I think that that, the unilateral determination by the

22   defense that these are not relevant is just not good enough.

23         MS. HARDY:  All right.  We will supplement the

24   privilege log.  We will identify within the bounds of what we

25   think does not waive the privilege what Ms. Lengnick did, what

1    documents exist and what documents exist, the Danyelle Wright

2    notes and the notes of the HR person, Michelle Zackay.

3              MR. HANNA:  I mean, and they're going to --

4              MS. HARDY:  And who was interviewed.  I mean, they --

5    Sonja Lengnick did a full interview to determine I think and

6    it's clearly she counsel providing, there's a pending case, we

7    get retained as a law firm.  We asked what --

8              THE COURT:  You have attorney/client documents on

9    here on your privilege log.  All I'm asking to you do is do the

10   same thing that you did otherwise.

11             MR. HANNA:  You know --

12             MS. HARDY:  All right, we will.

13             THE COURT:  And to then of course have the

14   supplemental brief that addresses some of the -- addresses the

15   nuanced issues raised regarding whether the statements made are

16   privileged to the investigators and whether the investigating

17   attorneys, whether the HR notes are covered by it and, you

18   know, there's obviously the --

19             MR. HANNA:  Judge, obviously that goes up to the

20   point in time where Maddox got terminated.

21             THE COURT:  Yes, that's what I'm referring to.  Yes.

22             MS. HARDY:  I'm sorry, what goes up until the point

23   in time?

24             MR. HANNA:  Investigation that was done up until the

25   time he was terminated in case they're trying to say well this

1    was this investigation, but it's separate, but it's really

2    about Malcolm Maddox being terminated because of this, you

3    know.

4              THE COURT:  That is definitely what I intended.  To

5    the extent that the defendant is saying that the documents are

6    privileged and that's obviously front and center of what we've

7    been discussing, then the documents need to be identified on

8    the privilege log.

9              MR. HANNA:  Judge, as far as the briefing since we

10   added a second section to it, do you think we should extend it

11   to more than five pages of briefing?

12             THE COURT:  No, I don't because I don't think -- I

13   think that, that you can identify the case law.  I understand

14   the arguments.  I already understand the arguments and I don't

15   need for you to regurgitate that and I am asking you to

16   exercise some discipline in applying and cite opinions that are

17   directly on point.

18             MR. HANNA:  And just for my fought benefit when you

19   as far as footnotes, is there a parameter where you don't want

20   them?  Do you want no footnotes?  Do you just want few?  I

21   mean, I understand that you --

22             THE COURT:  50 percent of your case law should not be

23   in the footnotes or more than 50 percent of your case law

24   should not be in the footnotes.

25             MR. HANNA:  Fair enough.

 1              THE COURT:  Footnotes should not take up more than

 2     half of the page.

 3              MR. HANNA:  Okay, that's fair.

 4              THE COURT:  Footnotes should not include the

 5     central -- the central case law that you're relying upon should

 6     be in the body.  Something that is incidental, you drop in a

 7     footnote, about if you're relying on that opinion, it shouldn't

 8     just be footnoted and crowded and have, you know, in single

 9     space.

10              MR. HANNA:  I just want to understand your preference

11     and that's no problem.

12              THE COURT:  You're saying my preference, but I'm

13     telling you that from the perspective of someone who's trying

14     to digest your arguments, it's just, it's really hard and I

15     don't know any judge that wants, you know, the primary case law

16     to be footnoted and I'm not the only one who would look at this

17     as a clear attempt to circumvent the page limit.

18              MR. HANNA:  I understand, Judge.

19              THE COURT:  So I don't think that you should just

20     interpret this as quote unquote "my preference", this is --

21              MR. HANNA:  It's just, it was a -- it's a

22     legally-complicated issue as evident by the fact that you

23     wanted additional briefings and that's why I wanted to just

24     give, put everything in there.

25              THE COURT:  That might be true, Mr. Hanna, but you

1    need to find, you need to learn to edit and this is just way

2    too much and it's way too much in the footnotes.

3            MR. HANNA:  Understood.  Thank you, Judge.  Judge,

4    should we discuss the briefing schedule?

5            THE COURT:  I will.  I'm just trying to get through

6    the rest because this is definitely a lot.  E-mails, is that

7    where we are now?

8            MR. HANNA:  And just for the record based on your

9    prior order and the case law, we are permitted to go ahead and

10   notice Ms. Sonja for deposition, correct?

11           THE COURT:  No, I did not say that you can notice any

12   attorneys for deposition.

13           MR. HANNA:  Okay.  Well, we'll address that issue.

14           THE COURT:  I said that you could subpoena the

15   employees who were interviewed.

16           MR. HANNA:  We discussed the case law regarding

17   deposing the --

18           THE COURT:  I understand that that's your position

19   and I told you that that's not my understanding of the law that

20   because someone is hired to give legal advice that leads to

21   someone's termination, that that attorney is then turned into a

22   witness.

23           MR. HANNA:  I mean, the ABA is very clear on that and

24   if it --

25           THE COURT:  Again, Mr. Hanna, please brief it.  I've

1    heard it.

2              MR. HANNA:  Understood.  Will do.

3              THE COURT:  Okay.  So I think when it comes to

4    e-mails, one problem is that you identify defendant's HR

5    personnel as one of the custodians.  Ms. Hardy, is that part of

6    the problem?  I understand that's part of the problem is the

7    number of custodians who are identified?

8              MS. HARDY:  May I allow Mr. Davis to respond?

9              THE COURT:  Sure.

10             MS. HARDY:  He handled the search and the review of

11   names.

12             MR. DAVIS:  Thank you, your Honor, and you're

13   speaking of RFP 30 at this point?

14             THE COURT:  Yes.

15             MR. DAVIS:  Yes, well, there's two issues, yes.  So

16   first he's noticed he wants to search all HR personnel

17   nationwide which would be, yes, that's hundreds of employees

18   likely.  That's definitely an issue, but even when we limit it

19   to the, umm, we've identified in our response that we're going

20   to do additional searches.  We've agreed to do an additional

21   search to try to resolve this and we've limited it to the four

22   HR people who could have any conceivable relation to the

23   allegations in the case and even doing the limited searches

24   that Mr. Hanna asked for, we have something like 75,000 e-mails

25   that are responsive to those requests with Tara or Edwards and

1    Malcolm or Maddox and then those four words, sex, hostile work

2    environment, so forth and as I've tried to explain to Mr.

3    Hanna, the word sex in a newsroom environment, every police

4    squadron talks about sexual assault is a hit and every e-mail

5    that mentioned sexual orientation, there's just a ton of false

6    positives here and it would be an immense effort to search

7    through these for frankly questionable relevance since we've

8    already turned over the investigation files, we've turned over

9    anything that's conceivably of relevance and he just wants any

10   e-mail that says the word sex and has Tara or Malcolm in the

11   e-mail as well.  That alone just limited to our people is about

12   75,000 e-mails at this point which is burdensome, overly

13   burdensome.

14          MR. HANNA:  Judge, we didn't ask for the word sex on

15   its own.  We asked for e-mails that say Tara Edwards and the

16   word sex.

17          THE COURT:  Well, it says Tara and sex or Edwards and

18   sex.

19          MR. HANNA:  Right.

20          THE COURT:  Malcolm and sex and Maddox and sex.

21          MR. HANNA:  Right, so all of --

22          THE COURT:  So as reporters they're saying that it

23   could end up being --

24          MR. HANNA:  So and in response to that e-mail that

25   Mr. Davis sent me last night, I responded and said okay, well,

1   you've clearly done the search and you're telling me you get

2   75,000 response e-mails, give me the breakdown, tell me which

3   one of these so when you do Tara and sex you're getting 50,

4   five, 100,000, whatever and then we could look at it and have

5   discussion and say okay, well that one's probably too big,

6   let's get rid of that, let's keep this and didn't respond to

7   that and then the other thing that we asked is whether his

8   electronic discovery expert conducted a service check?  In

9   these types of, you know, electronic and, you know, we've done

10  these on nationwide class actions with thousands of people and

11  a lot of times you will get one e-mail produced to you 400

12  times, right?  So when it -- I would guess that the, even the

13  75,000 number, that's probably more like 10,000 once you copy

14  all, you know, in the e-mail pages the fact that three of them

15  are just running white pages in the add and each of those pages

16  probably has okay or two lines of substantive into it, but

17  regardless, we're not asking for a categorical search.  We're

18  asking for a search limited, an advance search based on search

19  terms and a combination of search terms and I think anything

20  that has, that talks about Tara and some of the words that

21  we've listed or Maddox and some of the words we've listed is

22  highly relevant.  That said, I'm willing to further engage in

23  this process and I asked them to give me the breakdown of the

24  purported 75,000 and if we could look at that and have a

25  conversation, then we can say okay, well, this one might be a

1    little too big, maybe we can narrow this one in this manner to

2    make sure we're not getting as many miss-hits and go from

3    there.

4         MR. DAVIS:  Your Honor, my response --

5         THE COURT:  I'm trying to figure out, so what would,

6    what would, what type of documents -- why would the HR have all

7    this?

8         MR. HANNA:  Well, if they don't, then they're not

9    going to have that many responsive e-mails.  They're the ones

10   investigating these claims.

11        THE COURT:  Well, there would be a loss of false hits

12   maybe, but I'm just trying to figure out, I understand that the

13   allegations are that Mr. Maddox sent some obscene, you know,

14   messages to Ms. Edwards.

15        MR. HANNA:  Among other things.

16        THE COURT:  I'm trying to figure out what you're

17   anticipating the HR people would have?

18        MR. HANNA:  Well, if they're sitting there saying --

19   look, at the end of the day they have not disclosed every --

20   they say they've given us the investigative file?  I don't

21   really know what's fully out there.

22        THE COURT:  You don't answer my questions a lot,

23   Mr. Hanna.  I asked you a specific question.  What are you

24   anticipating that the HR department might have?

25        MR. HANNA:  If there's an e-mail in the HR department

1   for example that says well, you know, Maddox, umm, in this case

2   you should really fire him, you know, we messed up before when

3   we had this other case, there was a guy couple years back,

4   Maddox, and he said some of these terms are in there and we

5   didn't fire him and it's causing this colossal mess, we knew we

6   should have fired him for example.

7          THE COURT:  So you're not at -- I mean, why not ask

8   about e-mails or have you asked about e-mails regarding

9   Mr. Maddox and Ms. Edwards?

10         MR. HANNA:  Yeah.  I mean, well, this is that search.

11  You can't ask for e-mails on a categorical manner and actually

12  get a response.  You have to -- it wouldn't be fair to them

13  because how are they going search -- they'd have to seven their

14  whole pool which is kind of what I'm having to do in my issues

15  in the Facebook.  They --

16         THE COURT:  Well, let me ask them.  How would you do

17  that?  How would you search for e-mails regarding the

18  complaints that Ms. Edwards has about, you know, Mr. Maddox and

19  any of the investigation?

20         MR. DAVIS:  I believe that that search has been done,

21  your Honor, and that's a different here now and I just want to

22  be clear and I want to answer your question --

23         THE CLERK OF THE COURT:  Mr. Davis, just make sure

24  you turn the mic towards you so we can hear you.

25         MR. DAVIS:  Yes.  First, I just want to be clear.  So

1    the request here is not limited to --

2              THE COURT:  That's not what I asked you.  I asked you

3    how did you go about getting the e-mails.  You have already

4    turned over e-mails?

5              MR. DAVIS:  I -- yes, I believe, I believe and I was

6    not the person who did this, but I believe my understanding of

7    how that search would be if you're talking about here we know

8    who the HR people who would have been involved in, for

9    instance, the Maddox investigation.  We can look through their

10   e-mails in the relevant time frame that mentions Malcolm or

11   Maddox.  This is far broader because this is anyone in --

12             THE COURT:  I'm not asking you what that says.  I'm

13   trying to figure how to get Mr. Hanna the discovery he needs so

14   that can feel comfortable that you're not leaving out a

15   significant number of e-mails and so you're saying that his

16   search terms end up having 75,000 hits.  How can you assure

17   Mr. Hanna that he has received the relevant e-mails?

18             MR. DAVIS:  This is what I'd say, your Honor.  If he

19   limits it to the HR people, the four HR people and we can limit

20   it to the time frame, this is going from 2011 to the present.

21   If we can limit it to the time of the investigation, 2015 and

22   those four people, then I think that it would be a much smaller

23   number that we could look through.

24             THE COURT:  Well, obviously Mr. Hanna believes that

25   since there were ongoing investigations, that it's going to be

1    relevant up until the time that Mr. Maddox was fired, so what

2    about from 2000 -- from the time of the complaint, 2015 until

3    Mr. Maddox was fired?

4          MR. DAVIS:  I will reconfirm that we haven't already

5    produced everything for those four HR people and if we haven't,

6    then I think that that number would be far smaller and it would

7    be manageable, but I believe that may have already been

8    completed.  Like I said, the request that we're discussing --

9          THE COURT:  I know that.  I'm not going backwards.

10   I'm just trying to go forward and figure out how to get

11   Mr. Maddox -- Mr. Hanna what he needs.

12         MR. DAVIS:  If it's limited to the four people that

13   we've identified here and is 2015 to the present, if it hasn't

14   already been done, I think that's going to be a much smaller

15   number and we can do that.

16         THE COURT:  Would you use his search terms?

17         MR. DAVIS:  I could use those search terms and if --

18   I could use those search terms.  I would suspect and I'll tell

19   the Court this, I would suspect because the people who he has

20   included before included producers and that's who's getting all

21   these e-mail blasts that mentions sex assault in Oakland County

22   for instance.  Every day we're getting e-mails like that.  If

23   it's limited to HR people, I suspect the number for those

24   custodians will be lower, so I think that I could let him know

25   how many are in that time frame and those four people.

1          THE COURT:  Oh, because what we talked about was,

2    umm, it was -- the five custodians are, remind me of the five

3    custodians.

4          MR. HANNA:  Yes.  So it's Malcolm Maddox, Mike Murri,

5    Dave Manney, Edoardo Fernandez, Barbara Roethler, Glenda Lewis

6    and the HR people and as far as what he's saying, I

7    specifically said look, for because one of the custodians is

8    Malcolm Maddox and I'm saying, you know, don't do the ones that

9    have Malcolm and these things in there because obviously that

10   might lead to a mis-hit, but these individuals and we need to

11   go back as far as 2012, at least for the non-HR individuals

12   because for example Mike Murri, the manager, if there's an

13   e-mail there about Edwards harassment from him in 2013 and

14   nothing happened in response to that e-mail, that shows that

15   they had knowledge.

16         THE COURT:  Whose harassment?

17         MR. HANNA:  Edwards.

18         MR. DAVIS:  Edwards has admitted that she complained

19   once about Maddox and she gave the date so I'm not sure what

20   this is about.  This is the --

21         MR. HANNA:  It's not about her complaining, it's

22   about him receive -- okay, so for example we deposed a former

23   producer.  She testified that she advised her supervisor that

24   Tara Edwards was being sexually harassed in 2014.  If you

25   notice how they're wording their response, they're limiting it

1    to complaints made by plaintiff so if a third party said hey by

2    the way you need to watch out, Maddox is sexually harassing

3    her, they didn't give us that.

4            THE COURT:  Then ask that question.  You need to ask

5    that question --

6            MR. HANNA:  That is --

7            THE COURT:  -- and instead of searching for e-mails,

8    because it's -- what you're saying is there was one person and

9    you deposed that person.

10           MR. HANNA:  That's correct.

11           THE COURT:  Okay, so you can ask for evidence about

12   any e-mail communication between that person and Mr. Murri in

13   2014, but this is again, this is another type of fishing

14   expedition that you want to just look to see whether anyone

15   possibly made a complaint and to have this cast this wide net

16   where as they said, Ms. Edwards said that she made her

17   complaint in 2015.

18           MR. HANNA:  Let's take a look at it, Judge.  So for

19   example the first custodian is Malcolm Maddox.  If he has any

20   e-mail that has the words Edwards and one of these other, you

21   know, abrasive terms, I think that e-mail is discoverable and

22   that's, that's what's at issue here.  The next custodian is

23   Mike Murri, the manager.  If he has an e-mail that talks about

24   Tara Edwards and one of these words, that e-mail's discoverable

25   and that's all I need to --

```
1            THE COURT:  You know what, there's relevance and
2    you're saying discoverable.  There's relevance and then there's
3    proportionality and again it's not a fishing expedition so
4    you -- the very definition of what you said is there might be
5    within, you know, from 2011 until 2018, there might be an
6    e-mail that somebody sent to Mr. Murri saying that Mr. Maddox
7    is harassing Ms. Edwards, but in order to do that, we have to
8    get 75,000 e-mails.  That doesn't make sense and that's why we
9    need to look at how we're going to and, you know, I think it
10   goes without saying that discovery is not supposed to be
11   perfect, but just casting that wide net to potentially find
12   some diamond in the rough, some, you know, some needle in the
13   haystack, it just doesn't make sense.
14            MR. HANNA:  So how about we limit it, Judge, to from
15   2014 until the date of Maddox's termination?
16            THE COURT:  I think that we just said from 2015, the
17   time of her complaint until the time of his, umm, termination.
18            MR. HANNA:  I think it's highly relevant, Judge, if
19   we could go back a little bit, at least one year because
20   especially for and I can maybe limit it for that one year to
21   one custodian which is the manager because I think it's highly
22   relevant if in that one year prior to the complaint he was
23   receiving notice of what was going on, not taking any action
24   because they, you know, and then she finally complained
25   herself.
```

1          THE COURT:  Okay because you, but you only had one

2    person who said that she made that complaint.  See, you're

3    still -- it's still speculative.  It's still maybe somebody

4    made a complaint.

5          MR. HANNA:  I don't need to prove that discovery

6    exists for me to request it.

7          THE COURT:  That's true, but at the same time you

8    can't go on a fishing expedition.

9          MR. HANNA:  I mean, I think compared to their

10   requests, Judge, this is limited to five custodians and in an

11   advanced search of --

12         THE COURT:  Five custodians plus four human resources

13   personnel, so we're talking about nine custodians.

14         MR. HANNA:  Yeah, their requests was for all current

15   and former employees.

16         THE COURT:  And I said that that was too broad.

17         MR. HANNA:  No, their requests are granted for all

18   current and former employees, all communications, all text

19   messages, all e-mails and you've granted those requests.

20         THE COURT:  Regarding what?

21         MR. HANNA:  Regarding the text messages, regarding

22   the e-mails, regarding a lot of things.  Regarding the social

23   media.  It's for all current and former employees.  RFP number

24   two which was granted --

25         THE COURT:  For communicating with -- anyway, I'm

1    really exhausted by you saying you gave it to them because I'm

2    really trying to take each individual request, you know, and

3    analyze that and it really sounds like I'm talking to my child

4    when it's well, you gave it to them.  It's just, it's not

5    productive.  I'm trying to really get to relevant documents --

6            MR. HANNA:  I'm not trying to sound like a child, but

7    I'm just saying that I believe that --

8            THE COURT:  Okay, I need to not, umm, I need to try

9    to get a manageable amount of discovery.

10           MR. HANNA:  I understand, Judge.  Again, I'm not

11   trying to sound like a child, but I just think that that's

12   reflective of what the Court sees as being relevant and

13   discoverable.

14           THE COURT:  Well, yeah, but each time you compare

15   apples and oranges and I don't think that what you said is

16   actually -- anyway, I'm not, I'm not trying to compare -- it's

17   just not helpful and nothing that you said indicated 75,000

18   e-mails and so the defense has explained why this has resulted

19   in an over-inclusive and so I'm trying to narrow it down so

20   that it's manageable.

21           MR. HANNA:  Yeah, and --

22           THE COURT:  And so you're saying that there are

23   potentially other e-mails from 2014.  I don't see evidence of

24   that except that you said that one person said that they

25   mentioned it to or they reported it to the, umm, to Mr. Murri.

1    I told you that you could include that person, any e-mails

2    between that person and Mr. Murri dealing with, you know, her

3    complaint, but in terms of --

4              MR. HANNA:  It actually wasn't Mr. Murri, but --

5              THE COURT:  -- any custodian or anything from 2014, I

6    think that that is getting to a fishing expedition.

7              MR. HANNA:  So, I mean --

8              THE COURT:  I'm going to have to wrap this up

9    somehow.

10             MR. HANNA:  Well, what is the limitation that the

11   Court --

12             THE COURT:  So, umm --

13             MR. HANNA:  From 2015?  Is that what the --

14             THE COURT:  I asked you, so Mr. Davis said that from

15   2015, you said from 2015 to 2000 -- to Mr. Maddox's termination

16   was, did you just say with the four personnel?

17             MR. DAVIS:  With the four personnel, your Honor, I

18   believe that that would be a much smaller search because

19   they're not likely to get --

20             THE COURT:  Is Mr. Murri part of the --

21             MR. DAVIS:  No.  He's the general manager, your

22   Honor.

23             THE COURT:  So, but why wouldn't his, any e-mails to

24   him be relevant or included?

25             MR. DAVIS:  Well, we did do -- I mean, he was one of

1    the custodians.  I mean, as I stand here, I can't tell you how

2    many were in Murri's file.  I think his may be a little bit

3    less.  What I know is that there were 75,000 e-mails.  There's

4    about six, there's 10 custodians and it was about 75,000 or so

5    e-mails.  Now like I said, I believe the HR people have less

6    because one of the key reasons for this overbreadth is because

7    the word sex or sexual or harassment which are the terms that

8    he wants are very common in, umm, I just from the first

9    custodian looked at, they're very common.  I could go back to

10   Mr. Hanna and tell him this is how many are in Murri's e-mail

11   box with these search terms and these are how many who are in

12   the four HR people and maybe that will be a smaller number and

13   we can figure something out.  For instance --

14           THE COURT:  You said, and what about Glenda, what's

15   her name, Glenda?

16           MR. HANNA:  Glenda Lewis.

17           THE COURT:  Lewis.  So why do we need that from her,

18   Mr. Hanna?

19           MR. HANNA:  She was one of the people that spread,

20   you know, that perpetuated the hostile work environment with

21   Mr. Maddox.  Ironically she's also -- well, that's why.  She's

22   one of them, she's a very important witness and these are all

23   of the people that I have.  I have Malcolm Maddox who's Malcolm

24   Maddox.  I have Mike Murri who's the general manager.  I have

25   Dave Manney who is in-house counsel.  I have Edoardo Fernandez

1   who is a manager at plaintiff's facility and Barbara Roethler

2   who's the other manager at plaintiff's facility so I have three

3   immediate supervisors, the general counsel, Malcolm and one

4   witness or -- yeah.  Yeah.

5          MR. DAVIS:  Your Honor, Manney is not the general

6   counsel.  I'm not sure who Mr. Hanna's talking about.

7          MR. HANNA:  I'm sorry, Dick Manney is also a manager.

8   I was confusing him with some one else, so I have four

9   managers, forgive me, I have four managers at her facility who

10  are her direct report and that's all I've limited it to and I

11  think the fact that her management has information or potential

12  e-mails that talk about Tara Edwards and one of these words or

13  Malcolm and one of these words is highly relevant.

14         THE COURT:  Well, it may or may not and that's the

15  problem is whether or not these hits are going to be false hits

16  or relevant hits.

17         MR. HANNA:  And I'm willing to --

18         THE COURT:  And that's why I've asked Mr. Davis what

19  he did to assure that you covered the necessary information.

20         MR. DAVIS:  And let me take one step back, your

21  Honor.  If the search term was Malcolm Maddox or Tara Edwards,

22  that might be different, but there are lots of Taras and

23  Edwards is a common name and I know for a fact that a lot of

24  these hits are coming up with a different Malcolm who's on one

25  of these e-mails.  If it was limited to the full name, I

```
 1    suspect that would be a smaller number.  I think that the
 2    problem is when you're separating out variations of a name plus
 3    five variations of very, very common words, that's why we're
 4    getting the 75,000, in the news business, like I said.  So if
 5    we're going to have -- I would be willing to have a further
 6    conversation with Mr. Hanna.  I think that, you know, there's
 7    assumptions being made about, you know, how our electronic
 8    discovery is set up, but we can have that discussion off the
 9    record.  My point is is that it can be narrowed.
10              THE COURT:  All right.  I'm going to say that this is
11    one that you all need to meet and confer on.
12              MR. HANNA:  Yeah, I would, just to make this simple,
13    they're claiming 75,000.  Like I asked yesterday, just give me
14    the breakdown, let me know --
15              THE COURT:  That's why you're going to meet and
16    confer.
17              MR. HANNA:  And if the parties are not able to
18    resolve that?
19              THE COURT:  Then you can bring it back to my
20    attention.
21              MR. HANNA:  Okay.
22              THE COURT:  I'll talk about, umm, because it's almost
23    5:00 and we still have more to do and I have an interview
24    waiting on me that was supposed to start at four.
25              MR. HANNA:  I believe the remaining will be pretty
```

1    quick, Judge.

2          THE COURT:  I'm sorry?

3          MR. HANNA:  I believe the remaining will be pretty

4    quick, the remaining issues.

5          THE COURT:  Okay.  The text messages.

6          MR. HANNA:  Yeah, we haven't gotten a single text

7    message from defendant.  We've asked, we've limited it to a

8    few, I mean, they're, you know, they've literally moved to

9    compel what we've already produced.  They haven't produced a

10   single text message for these key witnesses which are the

11   manager Mike Murri, Malcolm Maddox who's Malcolm Maddox can

12   Dave Manney, Edoardo Fernandez and Glenda Lewis.  Five

13   custodians, you know, and there was two requests.  We've even

14   limited the, umm, we've limited this request to reflect the

15   same parameters that they requested for the text messages which

16   is, namely, you know, things that are concerning Tara Edwards,

17   Malcolm Maddox, the father of her child, her pregnancy, sexual

18   matters, rumors, retaliation, harassment, any complaints others

19   made regarding defendant and any document that the defendant

20   believes relates to their defense of the plaintiff's claims.

21   These are the exact --

22         THE COURT:  Okay, now when you say text messages

23   between these people --

24         MR. HANNA:  Yep.

25         THE COURT:  -- and relate it to harassment, sexual

1   matters.

2            MR. HANNA:  That's the exact same request that this

3   made for us.

4            THE COURT:  And I told them that that was, umm, that

5   this is not Tara Edwards and sexual matters, this is not

6   Malcolm Maddox and sexual matters, this is related to as an

7   individual category sexual matters.

8            MR. HANNA:  No, we've literally produced text

9   messages about her talking to current colleagues.

10           THE COURT:  You're not paying attention to what I'm

11  saying to you, Mr. Hanna.  You have A, Tara Edwards, B, Malcolm

12  Maddox, C, the father, so those are relevant to this case, but

13  then you have D, sexual matters and you're not saying sexual

14  matters, that's an individual category.

15           MR. HANNA:  Yeah.

16           THE COURT:  So Mr. Murri and Mr. Manney could be

17  having text messages with one another about sexual matters that

18  has nothing to do with Tara Edwards or Malcolm Maddox.

19           MR. HANNA:  That same information was compelled by

20  defendants and it was produced by plaintiff.

21           THE COURT:  I don't think that you're really

22  listening to what I'm saying.

23           MR. HANNA:  You're saying it's two third parties.

24           THE COURT:  Two third parties talking about sex with

25  people who have nothing to do with this case.

1          MR. HANNA:  Fair enough, Judge.  We'll limit it to

2    sexual matters relating to them.

3          THE COURT:  And rumors, so it's --

4          MR. HANNA:  Rumors relating to plaintiff and Malcolm

5    Maddox.

6          THE COURT:  Okay.  I think that the problem that I

7    understand that, umm, one of the problems is that they're

8    talking about their custody and so can someone speak to that?

9          MR. HANNA:  Yeah --

10         THE COURT:  No, I wanted the defense to speak to the

11   issue of custody of this information.

12         MR. DAVIS:  I will do that, your Honor, but if I

13   could go back at the end and discuss some of the other issues

14   that Mr. Hanna brought up because it is important, but as far

15   as custody, as we've stated, Murri, Manney -- I'm sorry, Murri,

16   Fernandez and Lewis -- I have to back up.  First, your Honor,

17   this is -- I actually have to address this first.  The actual

18   request and this is important --

19         THE COURT:  Okay.  Can you please address custody

20   because I, I, I asked for the custody issues.

21         MR. DAVIS:  I do, your Honor, but this is why it's

22   important.  The request was for any text messages sent or

23   received by the custodians concerning or related to Tara

24   Edwards or Reverend Rideout.  That was all that was requested

25   and we asked the custodians, the people who are still our

1    employees, Murri, Manney and Lewis, to search for any text

2    messages related to Tara Edwards and they reported that they

3    don't have any so we've responded to that -- I'm sorry,

4    Fernandez, right, and Dave Manney is no longer an employee.  We

5    asked him anyway if he would look and he did look and he

6    reported he has none about Tara Edwards and Malcolm Maddox, the

7    issue with him is we don't have custody of his cell phone.  He

8    was terminated.  He, assuming he has a company cell phone

9    which, he was not at the station when he was terminated.  We

10   don't have custody of his cell phone.  We don't even know where

11   he is.  Mr. Hanna has made it clear he can't even find Malcolm

12   Maddox to subpoena him, but somehow we're supposed to have

13   custody of the cell phone.  We don't even believe he's in the

14   state, so clearly if he can subpoena Maddox, he can ask Maddox

15   to turn over the text messages or ask him to turn over the cell

16   phone, but our obligation is limited to what we have in our

17   possession, custody or control and we don't have access to the

18   cell phone, so I'm not sure what else there is to do on that.

19        THE COURT:  So you're saying that you have no text

20   messages from Murri, Manney, Fernandez or Lewis, that they've

21   checked and they have no text messages that regard or regarding

22   Tara Edwards or Malcolm Maddox?

23        MR. DAVIS:  Regarding Tara Edwards which is what was

24   asked for, your Honor.  The request right here, I mean, this is

25   what -- this is --

1    MR. HANNA:  There's two requests.  There's 31 and 40.

2    You're looking at 31.  If you look at 40, it has that

3    specifically in there and Judge, these are third parties.  You

4    cannot ask a third party to, to search for you and say hey did

5    you look -- I mean, the order that was compelled for us, we

6    have to search it, we have to, we have to give an account to

7    defendants how it was searched --

8    THE COURT:  That's -- you know, again, you, you --

9    please tone it down.

10    MR. HANNA:  I just want the same treatment for both

11    sides and I would ask that they provide a log --

12    THE COURT:  I know, I know, Mr. Hanna.  I know that

13    you think that I've treated you unfairly.  I have not -- I've

14    tried to be as fair as possible and I have given -- I have

15    demanded things of the defense that they didn't want to

16    disclose.  I have narrowed their discovery requests and, umm, I

17    need you to tone it down.

18    MR. HANNA:  Sure.  Judge, if we go to the company

19    handbook --

20    THE COURT:  So, umm --

21    MR. HANNA:  If I may --

22    THE COURT:  -- Mr. Davis, you were looking at 40?

23    MR. DAVIS:  And again, Mr. Hanna is just expanding

24    beyond what 40 asked for.  It's text messages that are, umm,

25    that were between these individuals named that regarding

1   investigation into plaintiff's 2015 allegations of sexual

2   harassment, sexual misconduct, discrimination and/or

3   retaliation, so 40 is also limited to the investigatory

4   documents and as we've stated, we've turned over all the

5   investigatory documents.  I can confirm that none of those

6   are -- I can reconfirm that none of those are text messages,

7   but we've turned all of those over.  What the issue is here and

8   this is what's important to say, he's unilaterally expanding

9   the scope, from what he said because he had to turn over, so

10  now he wants us to turn over things about sexual matters and

11  rumors that don't have anything to do with Edwards?

12          THE COURT:  Okay, let me find this again so I can

13  look at the specific wording.

14          MR. DAVIS:  It's docket number 31-6 if that helps,

15  your Honor.

16          THE COURT:  It does help.

17          MR. DAVIS:  And it's page ID 862.

18          MR. HANNA:  Internally page 28 of the --

19          (Pause)

20          THE COURT:  Okay.  It does say in 40 regarding

21  investigation into plaintiff's 2015 allegations of sexual

22  misconduct and retaliation and then for 23?

23          MR. HANNA:  31, Judge.

24          THE COURT:  31?

25          MR. DAVIS:  That's page 856, page ID 856.

1          MR. HANNA:  Judge, our position is those terms are

2    encompassed --

3          THE COURT:  All text messages sent related to Tara

4    Edwards or Reverend Rideout and the answer to all those except

5    for Malcolm Maddox is none?  Is that your answer?

6          MR. DAVIS:  For Tara Edwards, yes.  We had a, we

7    objected to Rideout on relevance, but I think, yeah --

8          THE COURT:  Okay.

9          MR. DAVIS:  -- but for Edwards, then certainly, yes.

10   For everyone except for Maddox who we don't have his phone, the

11   answer is no.

12         THE COURT:  Okay.  So are you saying that the text

13   messages regarding Reverend Rideout don't concern Ms. Edwards?

14         MR. DAVIS:  Well, our position has been, your Honor,

15   and I don't know if you've ruled on this yet, but --

16         THE COURT:  No, I haven't, but I'm saying that you're

17   saying that the text messages regarding Reverend Rideout are

18   irrelevant and I'm asking you whether any of them relate to the

19   allegations Ms. Edwards made.

20         MR. DAVIS:  Your Honor, yeah, my answer if it related

21   to Edwards, we didn't withhold anything because Rideout's

22   mentioned in addition to Edwards and we made that clear in our

23   reply brief so if Edwards, it's Edwards and Rideout, then it's

24   covered by the Edwards assertion there is nothing.  If what

25   they're now asking for is things about Rideout unrelated to

1    Edwards, that's clearly irrelevant.  So we've addressed that in

2    our reply, your Honor, so that would be the answer.

3              THE COURT:  Mr. Hanna?

4              MR. HANNA:  Which part would you like me to address,

5    Judge?  The Rideout?

6              THE COURT:  Well, first all they're saying they have

7    no text messages and Malcolm Maddox is nowhere to be found, but

8    that the individual custodians other than Mr. Maddox that you

9    referred to don't have text messages regarding Ms. Edwards.

10             MR. HANNA:  Yeah, that's because they never searched,

11   Judge.  They -- we didn't get a single text message in response

12   to defendant's recovery request.  They just asked third parties

13   hey, do you have responsive texts.  According to their company

14   handbook, defendant reserve the right to monitor, access, read,

15   disclose and use any information on the equipment at any time

16   and without prior notice.  Mind you, Judge, we've limited this

17   request to the company, not their private cell phone.  The

18   equipment must also be returned at the time an employee leaves

19   the company.  They've clearly failed to secure his.

20             THE COURT:  Well, so whether they failed this their

21   procedure to secure the, Mr. Maddox's cell phone or not, if

22   they don't have the cell phone, then they don't have it.

23             MR. HANNA:  Yeah and that's a spoliation issue and

24   we'll deal with them.

25             THE COURT:  I actually, umm, you're saying that they

1   didn't turn over a single text message.  I'm not sure that I

2   would assume that any of these individuals would be discussing

3   the investigation by text message.  I would have course assume

4   that there would be some e-mails, but I will ask the defense

5   what steps did you take to assure that Mr. Manney,

6   Mr. Fernandez, Ms. Roethler, Glenda Lewis, that they have no

7   text messages referencing Ms. Edwards or Mr. Maddox or this, or

8   her allegations?

9        MR. DAVIS:  Like I said, your Honor, for the three

10  current employees would just asked them to review their own

11  text messages similar to the way Ms. Edwards was asked to

12  review her text messages for anything responsive and they said

13  there was nothing, so no, we did not impound their phones and

14  do it for them, but there is no -- he's cited nothing to

15  suggest that you're supposed to do that.  This was a very

16  simple search.  They're not -- we weren't asking them to sort

17  by relevance; do you have any texts about Edwards, very simple.

18  Manney is not even our employee so that was wholly gratuitous,

19  but we asked him the same thing.  Manney's now in New York with

20  a different station.

21        THE COURT:  Okay, so --

22        MR. DAVIS:  And Roethler was not one of the people on

23  this list here, so.

24        THE COURT:  I'm sorry, who wasn't?  Roethler is on --

25        MR. DAVIS:  I believe he mentiioned --

1          THE COURT:  -- oh, that's 35.  I'm sorry, I'm looking

2     at the wrong one.

3          MR. HANNA:  Judge, the difference between Edwards

4     doing this search and these third parties is Edwards is the

5     plaintiff and I'm asking the defendant.  I'm not asking -- if

6     defense counsel doesn't want to, that's similar to saying that

7     I don't have to, but that's not -- there's a difference between

8     that and asking Tara or asking the defendant so somebody that

9     the defendant can be held liable for their representation.  It

10    doesn't have to be counsel, it could be whoever, but to ask a

11    third party is not proper especially when it is in your custody

12    and control so they have not done the search.

13         MR. DAVIS:  Your Honor, they're not a third party,

14    they're our employees and we asked them.  I mean, again, if

15    Mr. Hanna had cited any authority suggesting that you can't

16    just ask your employees to produce documents, that's going to

17    really increase the cost of an investigation because you have

18    to have a lawyer go in and physically pull it out?  That's not

19    what the law is.  We asked our employees to search their files;

20    they did so.  He has to basis to suggest, particularly when he

21    hasn't even deposed them yet that they have not properly done

22    that search or they have withheld something.  He has no basis

23    for that.  It's been searched and there's nothing.

24         THE COURT:  Okay.  I'm going to deny it without

25    prejudice, but Mr. Hanna, you can ask these witnesses at their

1    depositions whether they engaged in any text messages and what

2    steps they took to search for any text messages.  If it turns

3    out that there, that they have not done an adequate job of

4    checking their text messages or if they are testifying to text

5    messages that weren't disclosed, then we can look further.

6              MR. HANNA:  I would object to that, Judge.  I think

7    that --

8              THE COURT:  Well, you can certainly objection to

9    everything to Judge Borman --

10             MR. HANNA:  Okay.

11             THE COURT:  -- and I'm sure that you will.

12             MR. HANNA:  The remaining items are the items, Judge,

13   that counsel for defendant conferred and said they would

14   produce and then they didn't actually end up producing it.

15   They indicated that they would amend RFP 42, interrogatory one

16   and interrogatory six.

17             THE COURT:  I'm sorry, I thought that I was --

18   that's -- I have text messages, okay, requests agreed to.  All

19   right.  Who's going to speak to that from the defense?

20             MR. DAVIS:  I can, your Honor.

21             THE COURT:  Did you agree that you're going to --

22             MR. DAVIS:  Yeah, let me address that.  First, let's

23   talk about the interrogatories.  Mr. Hanna, he served

24   interrogatory number and I don't know if your Honor needs to

25   pull it out, but it basically says please identify all people

1    that you believe are going to have substantive evidence

2    regarding the claims and allegations in this case and we

3    provided a list.  The protective order finally got entered and

4    then we produced all the addresses that were on that list.  It

5    seems like what Mr. Hanna's saying now is that we should have

6    expanded our list to include additional people that he wants to

7    add to the list, but that's, that's not what we agreed to.  We

8    agreed to give him the addresses that were not on the

9    unprotected version of interrogatory one, so if he wants to

10   file a new request for additional names, go ahead, but we've

11   responded to interrogatory one.  We've done what was asked.

12          MR. HANNA:  Judge, these are the people they

13   identified on their witness list.  This is not my people, these

14   are the people they identified on their witness list that are

15   current and former employees.  They indicated in their witness

16   list they're going to use testimony at trial, but they haven't

17   given that information aside from the additional individuals

18   that came out today regarding these other investigations that

19   were interviewed and had notes that also need to be included.

20          MR. DAVIS:  Your Honor, this is a different question.

21   Now is he saying that our interrogatory one response which

22   asked for a subjective impression of the defendant, we think

23   that a lot of these witnesses are irrelevant.  This is a

24   completely different issue.

25          THE COURT:  Okay, so it says I at four.  So in the

1   e-mail you said we will provide a revised interrogatory

2   response to RFP one with the contact information.

3            MR. DAVIS:  Correct, and everybody who is --

4            THE COURT:  They're saying that you did that.

5            MR. DAVIS:  Everyone who was previously identified in

6   interrogatory one without an address, we provided the

7   addresses.  What Mr. Hanna's saying is that we should have

8   added new names to the list and that's a completely different

9   issue.  That's not before the Court.

10            THE COURT:  And Mr. Hanna, what new names are you

11  saying?

12            MR. HANNA:  Well, they've listed 19 names on their

13  witness list:  Timothy Dye, Lisa Gass, Michael Glover, Jeremy

14  Johnson, Chris Jones, Jim Kiertzner, Tim Kochenderfer, Ann

15  Marie LaFlamme, Erin McDonald, Jordan Nagel, James Norber.

16  Nate Penn, Ramone Rosario, Nima Shaffe, Carol Spann, Sarah

17  Willets-Klinger --

18            THE COURT:  I -- I --

19            MR. HANNA:  I can provide them the names later,

20  judge, but they've --

21            THE COURT:  I'm trying to open the answers to

22  interrogatories.  So this motion doesn't say what the

23  interrogatories request and unfortunately this is not

24  opening -- oh, here it is.

25            MR. HANNA:  Would you like me to read it, Judge?

1          THE COURT:  Nope.  Okay, so it says identify the

2   name, telephone number, et cetera of anyone who has knowledge,

3   so Mr. Davis, why wouldn't you include the, everybody who's on

4   the witness list?

5          MR. DAVIS:  Your Honor, this is comparing apples and

6   oranges.  When we do a witness list, we include every name

7   that's basically popped up anywhere in discovery because we

8   don't want to be locked out later if we discover something

9   relevant.  That's a different question than what we agreed to

10  which is the answer to interrogatory one, we didn't give the

11  addresses, now we have a protective order and we gave him the

12  addresses so that's all that was really intentioned.  If he

13  wants to send a second interrogatory request asking for the

14  addresses of other people on the list, that's different and

15  we'll address that at that point, but that's not what's before

16  the Court and this is just a unilateral attempt to expand

17  what's actually before the Court and it's really not

18  appropriate so we have done what we said we were going to do

19  with respect to interrogatory number one.

20         MR. HANNA:  Judge, this is seriously curtailed

21  discovery.  They -- first of all they didn't give the address

22  and contact information of these individuals after the

23  protective order, they gave it four, five months after the

24  protective order after we moved to compel it and the same day

25  as their response.

1          THE COURT:  Okay, but those people are not at issue.

2    It's the additional people that were included on the witness

3    list.

4          MR. HANNA:  Right.  I mean, interrogatory number one

5    says identify name, address, telephone number, place of

6    employment, job title of any person who has, claims to have or

7    whom you believe may have knowledge or information pertaining

8    to any fact alleged in the pleadings.  They've identified

9    these -- these aren't even people I'm asking for that they

10   don't think are relevant.  These are people they've admitted

11   are by virtue of the fact that they've included them in their

12   witness list and they don't want to give us their contact

13   information.

14         THE COURT:  So Mr. Davis, there is a continuing duty

15   to supplement an interrogatory.  Why not, if you've included

16   the people on the your witness list, why not augment your --

17   why not supplement your interrogatory?

18         MR. DAVIS:  Your Honor, to the extent that like I

19   said to the extent that there are any names added to the

20   witness list that are added because we think it's, they have

21   information about the case as opposed to as I'm sure your Honor

22   knows we don't want to waive a witness, so the witness list is

23   probably broader than we the might be responsive to

24   interrogatory one so if there are any people on

25   interrogatory -- I'm sorry --

1          THE COURT:  But you think that this person may have

2    knowledge or information because you've included them on the

3    witness list.

4          MR. DAVIS:  It's witness, about the allegations in

5    his complaint which is not the same thing as what's on the

6    witness list, but no, we will supplement, your Honor, to the

7    extent that we believe that any of the new names on the witness

8    list are responsive to interrogatory one, then we'll

9    supplement.

10         THE COURT:  Why don't you just include the

11   information?  If you've included them on the witness list, why

12   not provide Mr. Hanna with the information?

13         MR. DAVIS:  We will.  We will, your Honor.

14         THE COURT:  You're saying to the extent that they

15   have something relevant.  I'm just saying --

16         MR. DAVIS:  Your Honor, if they don't have anything

17   relevant and we have their addresses, then we'll provide them,

18   but we may not.  I know some of these names are people that

19   Tara Edwards mentioned in her deposition and we may not have

20   that information.

21         THE COURT:  Well then include that.  You say, you

22   know, include that.

23         MR. DAVIS:  We'll include it, but if we don't --

24         THE COURT:  If you know their identifying

25   information, then provide it.

1              MR. DAVIS:  We will do so.

2              THE COURT:  Supplement and provide it.

3              MR. DAVIS:  And we will do so, your Honor.

4              MR. HANNA:  Finally, Judge, the defendant indicated

5    that they would amend request for production 42 and they did

6    not do that or supplement I should say, request for production

7    42 and they've not done that.

8              MR. DAVIS:  And that one's bound up.  I believe we

9    said specifically that we will address that as part of RFP 30

10   and RFP 30 is where we're at right now with all those e-mail

11   hits so that's, that's something that we are still trying to

12   resolve.  So it's right in the meet and confer letter that

13   Mr. Hanna attached.  We said that we'll supplement that in

14   response to RFP 30 and that's still at issue here, so, umm --

15             MR. HANNA:  We didn't move to compel this because

16   they said they were going to supplement it and then they didn't

17   supplement it.

18             MS. HARDY:  And we're still going to provide it, your

19   Honor, but we need to figure out this RFP 30 issue because --

20             MR. HANNA:  This is not limited to e-mails though.

21   This is beyond, this is not just e-mails.

22             THE COURT:  This is all documents concerning

23   referencing Malcolm Maddox's promotions, reassignments,

24   disciplinary history, basis for any reprimand or discipline.

25   What does this have to do with e-mails?

1        MR. DAVIS:  We've -- your Honor, let me pull up what

2   he's talking about in the meet and confer because again, we've

3   turned over the responsive documents.  I'll pull this out, your

4   Honor, I'm sorry.

5        MR. HANNA:  They said for RFP 42, the discovery

6   response to RFP 30 covers any documents or any conceivable

7   relevance of this case based on their relevance definition, but

8   then they said nevertheless, we will agree to do a revised

9   search based on the language below for the managerial RFP 30

10  custodians for RFP 42.

11       MR. DAVIS:  Which is what I just said, your Honor.

12  That was the limit of what we could agree to and it was in

13  connection with RFP 30 which is still at issue.  That's

14  precisely what I just said and like I said, as part of the

15  figuring out RFP 30, that's what I, that's what I will produce

16  anything that's responsive, but it's tied up to --

17       MR. HANNA:  But it's not limited to e-mails.

18       THE COURT:  But you did provide responsive

19  information, but you --

20       MR. DAVIS:  But to the extent that he's got these

21  additional e-mail searches, your Honor, it's called fishing

22  expedition, but once we've narrowed it down if there's any

23  e-mails in the managerial custodians there that are in addition

24  to what's already been produced, then that's what I agreed to

25  produce.

1      THE COURT:  I don't really understand because the

2  issue is all documents concerning Malcolm Maddox's promotions,

3  reassignments, disciplinary history, basis for any reprimand or

4  discipline.  Are you saying that you need do --

5      MR. DAVIS:  Your Honor, let me explain.  So we've

6  given over his personnel file.  We've given over his contract.

7  We've given over the material that would be ordinarily stored

8  in the course of business.  That was not sufficient.  Because

9  we are already going to do this additional search in RFP 30, I

10  told him that we'll look for it in the four managers there who

11  are Murri, Fernandez and the other two I'm blanking out on now,

12  but we're going to do that, the e-mail search for anything in

13  addition, but we've already turned over his personal file which

14  would include disciplinary history.  We've turned --

15      THE COURT:  Are you saying, Mr. Hanna, that there

16  would be e-mails with reassignments, disciplinary history,

17  basis for reprimand or discipline that are not included in the

18  personnel file?

19      MR. HANNA:  They -- if you look at their first

20  amended response --

21      THE COURT:  Okay, so can you answer the question?

22      MR. HANNA:  Yes, there's e-mails and other documents,

23  Judge.

24      THE COURT:  Okay, so and other documents?  I thought

25  this was e-mails?

```
1        MR. HANNA:  No, it's not.  My request was not limited
2   to e-mails and his response was not limited to e-mails.  If you
3   go to the -- here's what I e-mailed him with respect to this
4   conferral.  I said hi, Tom, I hope you are doing well, here are
5   the requests.  With respect to 42, in the spirit of compromise,
6   plaintiff is willing to limit the search to electronic
7   correspondence sent to or received by the custodians referenced
8   in RFP 30 so limited to those custodians and, two, documents so
9   it's not just e-mails, documents defendants stores in the
10  regular course of business that would contain documents
11  concerning referencing Maddox's promotions, reassignments,
12  disciplinary history and basis for any reprimand or discipline.
13       THE COURT:  So Mr. Davis, are you saying that they
14  are -- I guess I thought that Mr. Davis was saying he's given
15  all those documents except that something might be included in
16  e-mail.
17       MR. DAVIS:  I mean, it sounds like we're getting a
18  meeting of the minds, but that's what I'm still agreeing to do,
19  your Honor.  We've turned over the personnel, the official
20  files have been produced.
21       THE COURT:  Are you saying that you've turned over
22  every document that's responsive to 42 except that there might
23  be some additional documents and e-mails?
24       MR. DAVIS:  That's -- yes, that's what I -- that's my
25  standing, your Honor.  I'll reconfirm that, but that's my
```

1    understanding and the e-mail part is what's the hang-up here.

2            MR. HANNA:  That's not what is indicated in their

3    amended response.

4            MR. DAVIS:  Your Honor, then we --

5            MR. HANNA:  It says is by way of further

6    clarification as requested in plaintiff's counsel's letter,

7    defendants states as follows, this request is grossly overbroad

8    and contains no limitation as to custodian or to document that

9    would conceivably calculated to lead to discovery of relevant

10   information.  For example, all documents concerning referencing

11   Malcolm Maddox's reassignment could conceivably be understood

12   to include any e-mail or piece of paper that defendant's, on

13   defendant's premises at that merely mentions the fact that

14   Maddox became an anchor on Channel Seven, something that could

15   conceivably be in the hands of any station employee who would

16   receive notification of such general station-related

17   information.  The overbreadth means the defendant cannot

18   reasonably identify whether documents responsive to this

19   request exists without performing the unduly burdensome and

20   inappropriate search.  So my conferral was okay, fine, do it in

21   and where it would, you know, regularly be stored, I'm not

22   talking about the hypothetical paper airplane that has this

23   information.

24           MR. DAVIS:  Yeah and that's --

25           THE COURT:  You know, I guess I see that the problem,

1    Mr. Hanna, is that if Mr. Maddox received an e-mail saying

2    congratulations on your promotion, then that's referencing a

3    promotion and so, you know, this is a situation where sometimes

4    the, the better approach is all documents sufficient to show,

5    you know, Malcolm Maddox's promotions, reassignments,

6    disciplinary history, basis for any remand or discipline, not

7    every e-mail that references so you're moving to, you know, the

8    5:00 show.

9           MR. HANNA:  Well, the problem is, Judge, their

10   position is even though he went from one position to the main

11   morning anchor, that that wasn't a promotion, they didn't

12   promote him despite the fact that his later contracts confirmed

13   that he got paid hundreds of thousands of dollars more, so

14   their position is we never even promoted him so that's why I

15   kind of have to go a little farther to prove that --

16          THE COURT:  Yeah, but you want to go so far that it

17   could be literally an e-mail from a co-worker saying

18   congratulations on your promotion.

19          MR. HANNA:  Yeah, I would think that as manager --

20          THE COURT:  So and it doesn't seem like, how long was

21   he employed there?

22          MR. HANNA:  As far as that goes, Judge, we're happy

23   to limit that temporal scope to 2015, just 2015.

24          THE COURT:  So 2015, that would be covered in then

25   the e-mail search.

1          MR. HANNA:  If it's e-mail.  I mean, if there's some

2    kind of other documents that they have that they and then

3    because they --

4          THE COURT:  But I asked Mr. Davis and he said they

5    turned over everything and the only other, the only outstanding

6    documents would be the e-mails.

7          MR. HANNA:  They said they haven't turned it over.

8    They said it would be too hard to look.

9          THE COURT:  Mr. Davis told me that and I asked him

10   that question.  He said he's turned over every document and the

11   only other documents that might be out there are things that

12   were within the e-mail, so based upon the, the instruction to

13   meet and confer with the Malcolm Maddox e-mail search words

14   that you suggested and it would appear to me to capture any

15   promotions that occurred after Ms. Edwards made her complaint.

16         MR. HANNA:  No, the e-mail searches don't say the

17   word promotion at all.

18         THE COURT:  Well, you can add promotion.

19         MR. HANNA:  I mean --

20         THE COURT:  But I asked Mr. Davis directly.  He said

21   the only thing that hadn't been turned over was anything within

22   the e-mails.

23         MR. DAVIS:  Right, I mean and, yeah, so just so

24   obviously the first request was very, very, was overly-broad

25   for reasons we've stated and my understanding based on e-mails

1  back and forth to Mr. Hanna is what I stated to the Court.

2  Once he's limited it to documents that are in the ordinary

3  course, then of course it was going to get turned over.  He has

4  Maddox's contracts.  He has the employment file.  He has all

5  that stuff so once he's limited to the ordinary course, all

6  that's left is the e-mails.

7          THE COURT:  All right.  I have the young man sitting

8  in the back of the courtroom was supposed to be interviewed at

9  4:00 p.m., so if there is nothing else, I'm going to say that

10  the 42 will be included in the meet and confer over the scope

11  of the e-mails.

12          MR. HANNA:  Thank you, Judge.

13          THE COURT:  How long do you think you need to file

14  the supplemental brief regarding the attorney/client privilege?

15          MR. DAVIS:  Your Honor, I have a summary judgment

16  brief that's due Tuesday.  If I could have by Friday of next

17  week if that's possible, that would be helpful.

18          THE COURT:  Mr. Hanna, does that work for you?

19          MR. HANNA:  Judge, the big problem we have in this

20  case is they haven't -- we haven't been able to conduct any

21  depositions yet except for two so far because they've withheld

22  all contact information and we've got to get going on

23  discovery, so I can't --

24          THE COURT:  I'm talking about the attorney/client

25  privilege stuff and so he's asking for a week and-a-half.

1       MR. HANNA:  A week and-a-half, I mean, I think that's

2   a little excessive, but it's up to the Court at this point and

3   what is the schedule?  They're going to file and then we'll

4   file it a couple days later or how's this going to work?

5       MR. DAVIS:  Simultaneously --

6       THE COURT:  No, you're going to each file because I

7   don't need and I don't want responses, I don't want

8   sur-replies, I don't want any of that.  I just want your briefs

9   dealing with the discrete and nuanced attorney/client

10  privilege, five pages each on Friday is the day after, so

11  that's the 23rd.

12      MR. HANNA:  Just, Judge, for the record can you

13  reiterate the exact points you want in the briefs so we keep it

14  focused on that?

15      THE COURT:  No, I -- seriously, I need to -- I'm

16  supposed to -- I don't even know what his schedule is.  I don't

17  even know if he has a flight out.

18      MR. HANNA:  I apologize, Judge.

19      THE COURT:  And we've been on the Bench literally

20  since, you know, 1:45 and so this is a marathon and so I hope

21  that you captured it.  I reiterated more than once what I

22  needed regarding the attorney/client privilege to the extent

23  that it incorporates interviews of employees, you said that the

24  impressions of attorneys were discoverable, whether it

25  incorporates the human resources and that investigation and

1   I -- and, umm, then you also said that Sonja and I know it's

2   Sonja and so when you said her name, you know, it didn't

3   register at first.  Was it Ludnick?

4           MS. HARDY:  Lengnick.

5           THE COURT:  Lengnick.  Whether Sonja Lengnick,

6   whether she's a witness now, the things that you said, the

7   things that they said regarding, you know, whether or not the

8   attorney/client privilege covered those matters.

9           MR. HANNA:  Thank you, Judge.

10          THE COURT:  Okay.

11          MR. DAVIS:  Thank you, your Honor.

12          MS. HARDY:  Thank you for your time.

13          THE COURT:  All right, thank you.  All rise.  Court

14  is in recess.

15          (Hearing concluded at 5:25 p.m.)

16                      --     ---     --

17

18

19

20

21

22

23

24

25

```
 1              C E R T I F I C A T E

 2

 3

 4

 5

 6

 7          I, David B. Yarbrough, Official Court Reporter, do

 8     hereby certify that the foregoing pages comprise a true and

 9     accurate transcript of the digital voice recording of the

10     proceedings had in this matter on Tuesday, November 13th, 2018.

11

12

13

14

15     12/7/2018                  /s/ David B. Yarbrough

16     Date                       David B. Yarbrough,
                                  (CSR, RPR, FCRR, RMR)
17                                231 W. Lafayette Blvd.
                                  Detroit, MI  48226
18

19

20

21

22

23

24

25
```